[No. F020753. Fifth Dist. Feb. 28, 1995.]

HERBERT GRAY, Plaintiff and Respondent, v.
COUNTY OF TULARE et al., Defendants and Appellants.

**COUNSEL**

Lita O'Neill Blatner, County Counsel, Kathleen Bales-Lange and Ronald E. Rezac, Deputy County Counsel, for Defendants and Appellants.

Charles A. Goldwasser for Plaintiff and Respondent.

## Opinion

MARTIN, Acting P. J.—Herbert Gray was dismissed from his position as a captain with the Tulare County Sheriff's Department (Department) for, among other reasons, making statements in a local newspaper critical of the sheriff, Melvin Coley. Gray appealed his dismissal to the Tulare County Board of Supervisors (Board). A four-day evidentiary hearing followed before an administrative law judge who recommended to the Board that it deny the appeal. The Board adopted the recommendation, whereupon Gray filed a petition for a writ of mandate. The court granted the petition on the ground Gray's statements were protected speech and ordered a writ to issue directing the Board to set aside its action and reconsider its decision. The Board has appealed.

The question before us is whether Gray's statements were protected by the First Amendment to the United States Constitution. For the reasons set forth below, we hold they were not and reverse.

### Factual and Procedural History

Bob Wiley retired as the Sheriff of Tulare County in 1991, after serving in that position for 24 years. The leading candidates in the election to succeed him were his undersheriff, Doyle Hoppert, and Melvin "Butch" Coley. Coley, a former officer in the Department, had run unsuccessfully against Wiley three times previously. He won the election in November 1990 and was sworn into office on January 7 of the following year.

Herbert Gray was one of five captains in the Department, having risen to that rank after first being hired as a deputy in 1964. Gray and three of the other four captains, Larry McLaughlin, David Whaley, and Michael Scott, openly supported Hoppert during the 1990 election campaign. The fifth captain, Richard Morris, remained neutral.

Coley entered office with a low regard for Gray and some doubts about his loyalty. These doubts, according to Coley, limited his willingness to confide in Gray but did not prevent the two men from working together. Gray, for his part, assured Coley of his support. Nonetheless, relations between Coley and Gray were strained from the beginning of the new administration.

For example, Coley made several inquiries of Gray, then age 49, about rumors he (Gray) was planning to retire. Coley also asked, during what Gray characterized as an "inquisition," about reports former Sheriff Wiley had

used Department staff to follow him (Coley) and tap his phones during previous elections. And, a few weeks after taking office, Coley reassigned Gray from investigations to administration while transferring what had previously been the administrative captain's biggest single responsibility, budgeting, to someone else. Gray interpreted these actions to be retaliation for his previous support of Hoppert but he did not make any formal complaint.

Gray and some of the other captains came to feel they were being excluded from any policymaking role in Coley's administration. Coley met with all the captains initially but as time passed he began to rely primarily on the senior captain, Richard Morris, and later on the newly appointed under-sheriff, Jack Tyler. Coley also sometimes bypassed the captains to consult directly with their subordinates. This practice, according to some witnesses, helped to create an atmosphere of uncertainty and mistrust within the Department. It was in this context that the present controversy arose, centering around three of Coley's actions in particular: his appointment of an undersheriff; his reassignment of Sergeant Sergio Santos; and his authorization of several internal investigations.

### The Appointment of Undersheriff Tyler

On March 11, 1991, Coley appointed Jack Tyler, formerly a sergeant in the Department, to serve as his undersheriff. The appointment angered some officers, including Gray, who publicly criticized Coley for selecting someone they felt lacked the necessary experience. In an article appearing on March 14 in the Tulare Advance-Register under the headline "Coley criticized on undersheriff choice," Gray was quoted as saying, " 'I think Jack Tyler is eminently qualified as a painter, since he painted all of Coley's campaign signs,' . . . I think Sheriff Coley is rewarding him with a high-paying county position he's not qualified to hold." The article also included critical comments by Captain Morris and Lieutenant Gary Harris. It concluded:

"The sheriff also acknowledged he wasn't happy with the public airing of concern about Tyler, but was resigned to it.

" 'I didn't have any idea anyone would do this,' Coley said. 'But it's their constitutional right to voice their opinion . . . I don't think you can make everyone happy. There will always be someone disappointed with the appointment. I just hope every officer in the agency supports Mr. Tyler.' " A similar article appeared the next day in the Fresno Bee.

According to Tyler, Coley was "very angry, very upset" about the articles "and felt like he needed to do something." However, Tyler convinced Coley

not to take disciplinary action lest he (Tyler) lose the opportunity to earn the officers' confidence so soon after taking office. Consequently, no action was taken against the officers and none of them was instructed to refrain from making similar remarks in the future.

### The Santos Reassignment

Also in March, against his captains' advice, Coley transferred Sergeant Sergio Santos from his assignment as a narcotics detective to road patrol duty. The transfer, according to Coley, was based largely on what he perceived to be a morale problem within the narcotics unit. However, Santos had also supported Hoppert during the election campaign; he regarded Coley's action as retaliatory and filed a grievance with the county personnel department. In connection with the grievance, Santos solicited written statements of support from several officers, including each of the five captains. All five provided memos attesting to Santos's qualifications and performance. Two, McLaughlin and Gray, went further and asserted the transfer was politically motivated. Gray's memo, under the heading "PERSONAL OPINION," included the following:

"1.   There was no business reason to transfer Sergeant Santos.

"2.   Sergeant Santos will lose prestige, substantial overtime earnings, and other benefits. He will incur considerable expense for new uniforms and possibly transportation.

"3.   This is a disciplinary transfer.

"4.   The reason for the disciplinary transfer is that Sergeant Santos, on his own time and with his own money, opposed newly-elected Sheriff-Elect Coley in several elections.

"5.   The transfer is a grievable offense by newly-elected Sheriff Coley and a mis-use [sic] of power for political purposes, i.e., reward political friends and punish political enemies.

"6.   The transfer is a violation of Sergeant Santos' civil rights to support and campaign for the candidate of his choice on his own time and with his own money.

"7.   I don't know, but I can't rule out racial motives. He was replaced by a white male sergeant who does not speak Spanish; a major portion of the narcotics cases involve non-English speaking Mexican Americans."

None of the captains discussed their memos with either Tyler or Coley before providing them to Santos. All but Gray gave their memos directly to

Santos, and later provided copies to Tyler upon his request. Gray, on the other hand, sent his memo to the personnel department. Santos was later to testify he requested the memos because he had been told, as part of the grievance procedure, to submit a list of possible witnesses and a summary of their anticipated testimony. However, the personnel director denied the procedure required any such summary and described the practice of providing one as "extremely unusual."

Tyler and Coley first learned of the memos on May 9 in the course of a fact-finding interview held at the personnel department in connection with Santos's grievance. They turned the memos over to the county counsel's office for consideration as the basis for possible disciplinary action. The matter remained under evaluation until mid-July.

On July 17, Santos filed a wrongful termination suit against the county in federal district court. Copies of Gray's and Morris's memos were included in the pleadings and thus became public knowledge. Gray's memo, particularly his "personal opinion," was quoted at some length in news articles published the next day about the suit.

On July 18, Tyler served Captain McLaughlin with a notice directing him to appear for an interview to discuss his Santos memo. The notice was the first step in a disciplinary process which led eventually to McLaughlin's dismissal. Tyler served Gray with a similar notice the next day—the same day Gray's comments appeared in a local newspaper criticizing Coley for conducting internal investigations which Gray characterized as "politically motivated witch hunts."

*The Internal Investigations*

Early in his administration, Coley ordered several investigations into allegations of impropriety involving past and present Department employees, including Gray. These allegations included the personal use of Department funds and property, tampering with a personnel examination, internal leaks which compromised a local bookmaking investigation, and secret meetings in pursuit of a plan to divest Coley of control over the jail facilities. Coley initiated the investigations without the full knowledge and participation of all the captains, or at least against their advice. Gray in particular felt the investigations failed to follow proper internal procedures, were unfounded, and were politically motivated. He expressed his concerns to Coley and Tyler who persisted nonetheless.

On July 19—two days after Santos filed his lawsuit and one day after disciplinary action was initiated against McLaughlin—two articles critical of

the sheriff appeared in the Visalia Times-Delta. The main article, under the headline, "Captain rips 'paranoid' sheriff," reported on claims by Gray and McLaughlin that Coley was using Department resources and personnel to investigate his political enemies. The second article concerned Santos's lawsuit but also included an inset entitled "Captain speaks out" which stated in its entirety:

"The complete text of Herb Gray's statement, which he made while off duty as a political statement and not as part of his role as a Tulare County sheriff's captain:

" 'When Sheriff Coley was elected in November of 1990, the entire management team of the Sheriff's Office extended their friendship, their congratulations and their complete cooperation. Three weeks before he took office, he was provided an office in headquarters, he was briefed on all major issues, he was introduced to the men in the department and key government officials.

" 'Instead of focusing on major problems such as increasing demand for service and declining resources, he began secret investigations on his second day in office.

" 'These investigations can best be described as politically motivated witch hunts directed against Sheriff Coley's enemies. The targets have included the personnel director, the county executive, the Board of Supervisors, former Sheriff Wiley, former Under Sheriff Hoppert and their political supporters, including Sgt. Sergio Santos.

" 'The investigations started on Sheriff Coley's second day in office. They have consumed in excess of $100,000 in county funds. In seven months, they've produced no results, but the investigations are continuing. As a professional law enforcement manager, I am offended by the investigations, which I regard as an unprofessional abuse of power.

" 'I know Sheriff Coley is paranoid, and he may be psychotic. I feel sorry for the voters who elected him. They don't know what they have done. By the time they learn, he may have done tremendous damage.' "[1]

Later that same day, after reading the newspaper articles, Tyler placed Gray on administrative leave and initiated disciplinary proceedings against

---

[1] Gray acknowledged making these statements but claimed the main article ("Captain rips 'paranoid' sheriff') took his final comment out of context to create a "highly sensationalized" version of what he said. According to Gray: "At the end of my prepared remarks, the reporter demanded another motive for Sheriff Coley. I gave him my opinion about his motive. I said that, in my opinion, he's paranoid. He asked, 'How paranoid,' whether or not he could be

him which culminated in Gray's dismissal on September 20 for violating various county personnel rules and departmental policies.[2] The action was based on Gray's discussion of Santos's grievance with the press, his comments in the Visalia Times-Delta article, and his use of Department staff and facilities to prepare his memo in support of Santos.

Gray appealed his dismissal to the Board and a four-day evidentiary hearing was subsequently held before an administrative law judge (ALJ) to consider Gray's claims his dismissal was retaliation for his support of Hoppert, it violated his right of free speech, and it was an excessive penalty. The ALJ concluded Gray's Santos memo violated departmental rules but caused relatively little harm and was not sufficient by itself to justify dismissal; his "paranoid" comments were personal opinion unrelated to any issue of public concern and therefore were not protected speech; and his "witch hunt" comments did involve an issue of public concern (the misuse of public funds) but were not protected because Gray's interest in making them was outweighed by Coley's interest in maintaining order and authority within the Department. On this basis, the ALJ recommended to the Board that it deny Gray's appeal and uphold his dismissal. The Board adopted this recommendation by resolution on February 8, 1993.

Gray then filed a petition for writ of mandate seeking to set aside the Board's decision on the ground it was not supported by the evidence adduced at the administrative hearing. Following a hearing, the court granted the petition. It ordered a peremptory writ to issue directing the Board to set aside its decision and to reconsider its action and render a new decision in light of the court's finding that Gray's speech, on balance, was protected by the First Amendment "for the reasons set forth in [Gray's] Memorandum of Points and Authorities." That is, as it explained at the hearing, the court

psychotic. And I answered, 'I don't know. Could be.' " Gray did not attempt to retract or correct the account after the articles appeared, however.

[2]The "Amended Statement of Charges" alleged Gray violated the following provisions of rule 12 of the Tulare County Personnel Rules: "12.2 *Conduct Subject to Discipline* [¶] Any employee may be disciplined for cause, and such cause shall be based upon employee conduct during or outside of duty hours which reflects discredit upon the public service, the employee, the effective performance of the duty assignments of other County employees, or the effective performance of the department in which employed. [¶] Conduct which shall be deemed to constitute cause for discipline as described above, shall include, but not be limited to the following: . . . [¶] d) Inefficiency. [¶] e) Incompetence. . . . [¶] l) Discourteous treatment of the public or other employees. . . . [¶] n) Violation of these Rules, Department policies, or any written policies which may be proscribed by the County." It further alleged Gray violated the following sections of the sheriff's department "Manual of Policy and Procedure": 204 ("CHAIN OF COMMAND"), 403A ("CONFORMITY TO RULES AND REGULATIONS"), 409 ("PERFORMANCE OF DUTY"), 419 ("CRITICISM OF OFFICIAL ACTS"), 423 ("HARMONY AND COOPERATION"), 449 ("CONFIDENTIAL INFORMATION"), and 502 ("GENERAL BEHAVIOR").

based its decision entirely on Gray's free speech claim and did not consider the issues of political retaliation or excessive penalty. Moreover, the court's comments indicated it was particularly influenced by Gray's argument Coley had "invited" his, Gray's, disparaging remarks in the Visalia Times-Delta by failing to take any action in response to his earlier statements about the Tyler appointment.

## DISCUSSION

■ It is well established the First Amendment protects speech by public employees which involves matters of public concern. (*Waters* v. *Churchill* (1994) __ U.S. __, __ [128 L.Ed.2d 686, 694, 114 S.Ct. 1878, 1884]; *Rankin* v. *McPherson* (1987) 483 U.S. 378, 383 [97 L.Ed.2d 315, 323-324, 107 S.Ct. 2891]; *Connick* v. *Myers* (1983) 461 U.S. 138, 142 [75 L.Ed.2d 708, 716-717, 103 S.Ct. 1684]; *Pickering* v. *Board of Education* (1968) 391 U.S. 563, 574 [20 L.Ed.2d 811, 820-821, 88 S.Ct. 1731].) "Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions . . . ." (*Waters* v. *Churchill, supra,* __ U.S. at p. __ [128 L.Ed.2d at p. 698, 114 S.Ct. at p. 1887].) " '[T]he threat of dismissal from public employment is . . . a potent means of inhibiting speech.' [Citation.] Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 384 [97 L.Ed.2d at p. 324].)

On the other hand, the government as an employer has far broader powers to regulate the speech of its employees than it has as sovereign to regulate the speech of citizens in general. (*Waters* v. *Churchill, supra,* __ U.S. at p. __ [128 L.Ed.2d at pp. 697-699, 114 S.Ct. at pp. 1886-1888]; *Pickering* v. *Board of Education, supra,* 391 U.S. at p. 568 [20 L.Ed.2d at p. 817].) "The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." (*Waters* v. *Churchill, supra,* __ U.S. at p. __ [128 L.Ed.2d at p. 699, 114 S.Ct. at p. 1888].)

In determining whether a dismissal impermissibly infringed upon a public employee's First Amendment rights, the threshold question is whether the

employee's speech related to a matter of public concern. (*Rankin* v. *McPherson*, *supra*, 483 U.S. at p. 384 [97 L.Ed.2d at p. 324]; *Connick* v. *Myers*, *supra*, 461 U.S. at p. 146 [75 L.Ed.2d at p. 720].) If so, the court must then "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (*Pickering* v. *Board of Education, supra*, 391 U.S. at p. 568 [20 L.Ed.2d at p. 817].)

The ultimate issue—whether the employee's speech is protected—is a question of law. Thus both steps in this two-pronged analysis are subject to the court's independent review on appeal. (*Rankin* v. *McPherson, supra*, 483 U.S. at p. 386 [97 L.Ed.2d at p. 325]; *Connick* v. *Myers, supra*, 461 U.S. at pp. 148, fn. 7, 150, fn. 10 [75 L.Ed.2d at pp. 720-722]; *Chico Police Officers' Assn.* v. *City of Chico* (1991) 232 Cal.App.3d 635, 643, 648 [283 Cal.Rptr. 610]; *Franklin* v. *Leland Stanford Junior University* (1985) 172 Cal.App.3d 322, 330-331 [218 Cal.Rptr. 228].)

1. *Gray's Statements Addressed Matters of Public Concern.*

■ Not all issues which arise within public agencies are matters of public concern. "Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. [Citation.] On the other hand, speech that concerns 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection." (*McKinley* v. *City of Eloy* (9th Cir. 1983) 705 F.2d 1110, 1114, quoting *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 102 [84 L.Ed. 1093, 1102, 60 S.Ct. 736], fn. omitted; see also *Connick* v. *Myers, supra*, 461 U.S. at pp. 148-149 [75 L.Ed.2d at pp. 720-722].)

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (*Connick* v. *Myers, supra*, 461 U.S. at pp. 147-148 [75 L.Ed.2d at pp. 720-722], fn. omitted.) ■ Viewed from this perspective, Gray's statements in the Visalia Times-Delta, and in his memo in support of Santos, were not limited to purely personal grievances with Sheriff Coley but related more generally to allegations Coley was misusing the resources and prerogatives of his office to punish his political enemies within the Department. These were legitimate matters of public concern.

The public has an interest in the misuse of public funds, wastefulness, and inefficiency in the management of public agencies (*Chico Police Officers' Assn.* v. *City of Chico, supra,* 232 Cal.App.3d at p. 647; *Roth* v. *Veteran's Admin. of Government of U.S.* (9th Cir. 1988) 856 F.2d 1401, 1405) as well as in the ethical operation of the agency in accordance with applicable rules and regulations (*id.* at p. 1406). The interrelationship between management and employees, and its effect on internal discipline and morale, are closely related to the agency's efficient performance of its functions. (*McKinley* v. *City of Eloy, supra,* 705 F.2d at p. 1114.) And "the way in which an elected official or his appointed surrogates deal with diverse and sometimes opposing viewpoints from within government is an important attribute of public service about which the members of society are entitled to know." (*Id.* at p. 1115.)

Nor did Gray's statements lose their protection because they included his personal opinion Coley was paranoid and possibly psychotic—an assessment which was closely related to Gray's more general allegations of political retaliation. This situation is thus distinguishable from that in *Yoggerst* v. *Hedges* (7th Cir. 1984) 739 F.2d 293, where the employee's personal opinions were unaccompanied by any reference to her superior's job qualifications or performance. Thus, the statements, viewed in their entirety, were addressed to issues of public concern. (*Chico Police Officers' Assn.* v. *City of Chico, supra,* 232 Cal.App.3d at p. 648.)

### 2. *Gray's Statements, on Balance, Were Not Protected.*

Recognizing the wide variety of situations in which public employees might be disciplined for making statements critical of their superiors, the courts have declined to propose a general standard by which such statements should be evaluated. (*Pickering* v. *Board of Education, supra,* 391 U.S. at p. 569 [20 L.Ed.2d at pp. 817-818].) ■ Nonetheless, several factors have been identified which bear on the balance to be struck between the employee's right to comment on matters of public concern and the public agency's interest in maintaining order and efficiency.

"In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. [Citations.] We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. [Citation.]

"These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 388 [97 L.Ed.2d at pp. 326-327].)

■ In the instant case, there was considerable testimony at the administrative hearing regarding the nature of the working relationship between Coley and the five captains. On an organizational chart of the Department, the captains occupy positions immediately below that of the undersheriff. They are considered "major executives" within the meaning of the Department's "Manual of Policy and Procedure," directly responsible for implementing the sheriff's directives and advising him on matters of policy. Each is assigned a particular area of responsibility: administration, custody, corrections, operations, or investigations. Coley described the role of the captains as follows: "A captain is considered to be an executive. They're a cog or a cornerstone of the agency. The day-to-day operations of the sheriff's office requires the full cooperation of the captains. They're responsible for running their own divisions on a day-to-day basis. They deal with personnel matters. They work out problems that may crop up. They also are the eyes and ears of the agency, and that being that we have—the undersheriff and I have to depend on the captains to keep us informed as to what's going on on a daily basis. The captains meet with the undersheriff for the purpose of informing the undersheriff as to what's transpired within their particular divisions. The various issues are discussed. We put a lot of weight on information that we receive from the captains. And at the same time, the captains are charged with the responsibility of carrying out directives or orders that I've made or that I've handed down. It's a responsibility to see to it that ever [*sic*] single employee in that agency is familiar and informed as to what I want." Coley went on to explain that trust and confidence are essential to the relationship, an assessment echoed by Undersheriff Tyler and by John Duffy, a former sheriff of San Diego County who testified as a law enforcement expert. Duffy described law enforcement agencies as essentially paramilitary organizations in which discipline and loyalty are especially important. (See, e.g., *Wulf* v. *City of Wichita* (10th Cir. 1989) 883 F.2d 842, 861; *Kannisto* v. *City and County of San Francisco* (9th Cir. 1976) 541 F.2d 841, 843; *Unruh* v. *City Council* (1978) 78 Cal.App.3d 18, 24-25 [143 Cal.Rptr. 870].)

Gray does not dispute that, structurally at least, he occupied a position requiring him to work closely with Coley on a daily basis, and that loyalty

and trust were necessary if he was to perform effectively. However, he argues Coley mistrusted him from the outset of the new administration, based on his support of Hoppert, and refused to give him any meaningful role in the management of the department. He claims, in other words, that his relationship with Coley had already deteriorated to the point that the appearance of the Visalia Times-Delta articles did not cause any further harm. There was sharply conflicting testimony presented at the administrative hearing on this point. Gray and the other captains testified they never enjoyed a close working relationship with Coley; Coley and Tyler testified they were able to work effectively with the captains, and actually did, until the appearance of the newspaper articles.

There is some disagreement among the courts about the extent to which the government must show critical speech actually disrupted the efficient operation of the agency. In *Connick* v. *Myers, supra,* 461 U.S. 138, the Supreme Court said: "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." (*Id.* at pp. 151-152 [75 L.Ed.2d at pp. 722-723], fn. omitted.) In *Rankin* v. *McPherson, supra,* 483 U.S. 378, however, the court held the government had failed to show its interests outweighed those of its employee because "there is no evidence that [the employee's statements] interfered with the efficient functioning of the office." (*Id.* at p. 389 [97 L.Ed.2d at p. 327]; see also *Pickering* v. *Board of Education, supra,* 391 U.S. at pp. 570-571 [20 L.Ed.2d at pp. 818-819]; *Wulf* v. *City of Wichita, supra,* 883 F.2d at pp. 861-862.) This language led the court in *Chico Police Officers' Assn.* v. *City of Chico, supra,* 232 Cal.App.3d 635, to conclude harm no longer may be presumed; rather, the government " 'must demonstrate actual, material and substantial disruption.' " (*Id.* at p. 650, quoting *Roth* v. *Veteran's Admin. of Government of U.S., supra,* 856 F.2d at p. 1407.) In its most recent discussion of the subject, the Supreme Court noted: "[W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative." (*Waters* v. *Churchill, supra,* __ U.S. at p. __ [128 L.Ed.2d at p. 697, 114 S.Ct. at p. 1887].)

We need not decide whether Gray's published statements caused the breakdown in his relationship with Coley or merely reflected the preexisting

state of affairs. Irrespective of any ill feelings between the two men, Gray's position continued to require they be able to work closely together. Moreover, the record shows Gray's statements contributed significantly to a public debate about discord within the Department which fostered dissension and impaired Coley's ability to manage.

In an article in the Visalia Times-Delta on July 20 entitled *"Unrest at Sheriff's Department, 'Difficult' months mark sheriff's start,"* Sergeant Santos's lawsuit and Gray's "witch hunt" comments were cited as examples of controversies which had caused county officials to "worr[y] about the future of law enforcement in Tulare County" and to consider "stepping in" if the matters were not resolved. An editorial a few days later pointed to these same incidents as having "given the people who voted for [Coley] plenty of reasons for doubt" about his ability to provide competent leadership. Editorials decrying the unrest within the Department also appeared in the Porterville Recorder, and several letters to the editor were printed in an unidentified newspaper under the heading *"Turmoil in the Sheriff's Department[:] Readers slam critics of Coley."*

William Harbottle, a former president of the Tulare County Deputy Sheriff's Association who appeared at the administrative hearing on Gray's behalf, testified patrol officers were often asked by citizens who had seen the articles about what was going on. And he stated the articles, although they did not affect the delivery of services to the public, had contributed to a division of loyalties within the Department. Thus the record lends considerable support to Coley's assertions the articles brought discredit to the Department, created dissension and mistrust, and undermined morale. (*Sprague* v. *Fitzpatrick* (3d Cir. 1976) 546 F.2d 560, 565-566.) In addition, Coley testified the controversy generated by the articles caused him to avoid implementing other decisions for fear of a similar response.

Several other considerations also affect our review of this evidence. As previously noted, one such consideration is the manner, time and place of the speech. (*Connick* v. *Myers, supra,* 461 U.S. at p. 152 [75 L.Ed.2d at p. 723].) The danger that a public employee's critical remarks will impair an agency's efficient operation increases in relation to how widely and publicly they are disseminated. (See *Rankin* v. *McPherson, supra,* 483 U.S. at p. 389 [97 L.Ed.2d at p. 327]; *Chico Police Officers' Assn.* v. *City of Chico, supra,* 232 Cal.App.3d at pp. 651-652.) Here Gray arranged to meet with a reporter to deliver comments he had prepared in advance; he testified, "This wasn't just an off-the-cuff statement." The comments were made in the midst of the controversy already created by Santos's lawsuit and the disciplinary action against McLaughlin. Given the nature of Gray's allegations and the circumstances under which they were made, it was predictable they would receive the widest possible distribution.

The context in which this dispute arose also weighs in favor of finding Gray's statements were not protected. "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." (*Connick* v. *Myers, supra,* 461 U.S. at p. 153 [75 L.Ed.2d at p. 724].) Gray described several incidents which caused him to believe he, among others, was the object of retaliation for supporting Hoppert in the 1990 election: his "interrogation" about retirement and political spying; his transfer from investigations to administration; and his exclusion from any policy-making role within the department. In addition, his personnel file was among those examined in the course of an internal investigation into the possible misuse of Department property. And it is reasonable to assume, in light of the disciplinary action begun against Captain McLaughlin on the eve of Gray's statements to the press, that he anticipated similar action would be taken against him. That is, Gray likely perceived the "politically motivated witch hunts" about which he complained were directed in part against him. Although this did not diminish his right to speak out about the investigations, it is nonetheless relevant in determining whether his statements were protected. (*Ibid.*)

The nature of Gray's statements is also relevant. In *Pickering* v. *Board of Education, supra,* 391 U.S. 563, a public school teacher was dismissed for sending a letter to a local newspaper criticizing the school board's budget policies. The Supreme Court reversed. It held the record failed to establish the teacher's statements had impaired the board's ability to function, noting that the statements involved matters of public record and easily could have been rebutted. Thus the court concluded the situation was not one in which "any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." (*Id.* at p. 572 [20 L.Ed.2d at p. 819].) The court declined to decide whether, were that not the case, an employee reasonably could be required to make "substantial efforts to verify the accuracy of his charges before publishing them." (*Ibid.,* fn. omitted.) Other courts have since suggested that statements which are knowingly or recklessly false are less deserving of First Amendment protection. (*Wulf* v. *City of Wichita, supra,* 883 F.2d at p. 858.) Although we do not conclude Gray's statements were knowingly or recklessly false, in our view it is significant that they suggested he had access to inside information which, given the confidential nature of the internal investigations, Coley was unable to refute. Indeed, Coley was quoted in related articles as declining to respond to Gray's allegations for that reason.

Finally, Gray's published statements violated written provisions of both the county's personnel rules and the Department's policy manual. (*Connick*

v. *Myers*, *supra*, 461 U.S. at p. 153, fn. 14 [75 L.Ed.2d at p. 724].) Gray's claim to the contrary is unpersuasive. He argues Coley effectively abrogated these provisions, and "invited" his disparaging remarks, by repeatedly promising during his campaigns for sheriff to conduct an open administration; by publicly stating that critics of his Tyler appointment had a constitutional right to voice their opinions; and by failing to discipline Gray after the Tyler incident or to warn him not to make similar statements in the future. According to Gray's testimony at the administrative hearing, he understood Coley to have thereby granted to every Department employee a license to say whatever he or she wanted to anybody, without any limits whatsoever.

This interpretation strains common sense. Coley's campaign statements, and his silence in the face of earlier criticisms, can hardly be equated, as Gray asserts, with Coley's "welcoming" or "inviting" public attacks on his administration. Nor can they be reasonably understood to repeal established departmental policies, much less county personnel rules over which Coley had no control. Coley's observation that employees have a constitutional right to voice their opinions does not suggest employees also have a right to make statements which go beyond the protections afforded by the First Amendment.

Gray presented several witnesses who stated they too believed Coley had encouraged a more open discussion of his administration than apparently had been tolerated under the former sheriff. Significantly, however, two of these witnesses (Deputy Harbottle and Lieutenant Hardin) testified there continued to be limits on public discussion of internal matters, and Gray's "paranoid" comments were inappropriate if for no other reason than they were likely to draw an unfavorable response from Coley. Indeed, Gray himself admitted he had doubts about whether Coley would have permitted the comments if asked about them beforehand; he speculated Coley's open administration policy was actually intended to elicit criticism of former Sheriff Wiley.

Thus, in view of the entire record before us, we reject Gray's contentions Coley invited his critical statements and failed to give him adequate notice the statements would subject him to disciplinary action. We conclude Gray's statements to the Visalia Times-Delta, although related to matters of public concern, substantially disrupted the efficient operation of the Department. For all the reasons we have set out above, his interest in making the statements was outweighed by the sheriff's interest in maintaining order and discipline. Accordingly, Gray's statements were not protected by the First Amendment and Coley was justified in dismissing him for having made them.

The judgment is reversed. The parties to bear their own costs of appeal.

Vartabedian, J., and Buckley, J., concurred.

A petition for a rehearing was denied March 21, 1995, and respondent's petition for review by the Supreme Court was denied May 25, 1995. Kennard, J., was of the opinion that the petition should be granted.