[No. C053253. Third Dist. Oct. 10, 2007.]

SHARON SAGER, Plaintiff and Respondent, v.
COUNTY OF YUBA, Defendant and Appellant.

**Counsel**

Porter, Scott, Weiberg & Delehant, Porter Scott, Carl L. Fessenden and Thomas L. Riordan for Defendant and Appellant.

Mastagni, Holstedt & Amick, Miller, Johnsen & Uhrhammer and Steven W. Welty for Plaintiff and Respondent.

OPINION

**MORRISON, J.**—The County of Yuba adopted the conclusions of an administrative law judge (ALJ), who found that Sharon Sager should be retired from her position as a deputy sheriff III due to her mental condition. Sager obtained a writ of mandate compelling the county to vacate its decision, and the county appealed.

We conclude that the trial court misapplied the standard of review, disregarded significant evidence, and applied the wrong substantive standard to determine whether Sager was fit for duty. We reverse with directions to deny Sager's petition.

In addressing the above points, we will limit our discussion of the facts. The record has been sealed, as it contains private details about Sager's mental health. However, we must discuss *some* facts in order to provide an opinion "in writing with reasons stated" as required by the California Constitution. (Cal. Const., art. VI, § 14.)

## BACKGROUND

Sager has been a peace officer for over 30 years, including over 20 years as a deputy with Yuba County (the County). Although there are many positive entries in her personnel record, including exemplary service during floods, during a major fire and at other times, there are also many negatives.

In 1992, Sager was evaluated after a mental crisis. Dr. Newton cleared her for duty after about one month; he recommended that she see a psychiatrist to consider medication and enter therapy, but she did neither; other mental health professionals cleared her for duty.

In January 2000, Sager delivered a written complaint about personnel issues within the department to Sheriff Black, at Black's home. Sager was very emotional and took six weeks off to deal with her emotional problems.

In July 2000, Sager tried to kill herself by overdosing on pills. After a mental health evaluation by Dr. Gordon Wolf, she was returned to duty on August 2, 2000, but with "qualifications," the nature of which were disputed. In any event, subsequent daily evaluations of her work by supervisors were positive and daily supervision of her was discontinued after about one month.

In November 2000, Sager became upset when an officer with less seniority was designated "Officer in Charge" when the assigned sergeant was ill. She turned in her gun, keys and identification and said she quit. Later she tried to

rescind her resignation. A visiting superior court judge (M. Kathleen Butz, now an associate justice of the Court of Appeal), ruled in September 2001 that Sager's rescission was valid, and ordered her reinstated with backpay.

In June 2001, Sager used department resources to locate the Sacramento home address of a deputy district attorney with whom Sager believed her husband (also a deputy district attorney) was having an affair. She found her husband at the woman's house and told the woman she had better lock her back door; she later called the woman and said something like "if [I] wanted to shoot [you] [I] could do so at the courthouse." At a hearing on a civil harassment complaint against her, Sager testified that she meant to *reassure* the other woman that she did not plan to shoot her.

In December 2001, Sager entered a courtroom during testimony in a preliminary hearing in a gang case. Her husband was the prosecutor and the other woman was in the audience, sitting with some peace officers. Sager approached and demanded that the other woman "stop fucking my husband"; although the criminal proceedings were not disrupted, several people present in the courtroom heard this statement.

Sager's counsel on appeal states that Sager's conduct towards the other woman reflects "extreme restraint," and was "normal, restrained and understandable" in context. We do not agree: Even the most favorable interpretation of this incident reflects Sager's inability to control her anger and lack of sound judgment while under stress.

In October 2001, Sager obtained a positive fitness evaluation from her own expert, Dr. Bill Falzett. This three-page report concludes she can perform the duties stated on the job description for the classification of "Senior Patrol Deputy," although she is a "Deputy Sheriff III."

The County sought a new fitness evaluation from Dr. Wolf, and after delays caused by a dispute about Sager's refusal to sign release forms, Dr. Wolf filed a report in April 2002 finding that Sager was unfit for duty due to her mental condition. Dr. Wolf prepared a supplement to his report in June 2002.

Later in June 2002, Sheriff Black found Sager was unfit for duty. Sager sought an administrative appeal and the matter was heard by an ALJ. In August 2004 the ALJ issued a 23-page decision finding Sager was not able to perform her duties.

After discussing the evidence, the ALJ concluded, as to the mental expert testimony: "The opinion of Dr. Wolf was more persuasive than that of

Dr. Falzett because of the greater quantity and more reliable quality of the information Dr. Wolf compiled and used as bases for his opinions. Appellant clearly has emotional and mental conditions which adversely affect her exercise of the powers of a peace officer, thereby subjecting the public to significant risk." He later stated, "Pursuant to the POST [(Peace Officer Standards and Training)] standards and Government Code section 1031, subdivision (f), appellant has emotional and mental conditions which adversely affect her exercise of peace officer powers and incapacitate her from performing her usual and customary duties as a Deputy Sheriff . . . ." The County adopted the ALJ's decision as its own.

Sager filed a petition for a writ of mandate to overturn the administrative finding and the trial court found in her favor. The County appealed.

## DISCUSSION

### I.   The trial court misapplied the standard of review.

The trial court was required to exercise its independent judgment of the evidence before the County. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44–45 [112 Cal.Rptr. 805, 520 P.2d 29].) In so acting the trial court had the power to make credibility findings. (*Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658–660 [53 Cal.Rptr.2d 4].) However, the trial court decision does not turn on credibility issues.

In the statement of decision the trial court explained that it "is to first review with a presumption of correctness the administrative findings and then, after affording the respect due to the findings, exercise independent judgment in making its own findings." This is not an accurate statement of the appropriate standard the trial court should have applied.

■   The trial court should have begun with a *strong presumption* that the County's decision was correct, and placed on Sager the *burden of proof* to show that the decision was against the weight of the evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816–820, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693] (*Fukuda*).) As explained by the California Supreme Court, " '[R]arely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts.' " (*Id.* at p. 814; see *Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1130–1131 [108 Cal.Rptr.2d 102] (*Mason*).)

The County objected to the trial court's formulation of the standard of review.

## II.  The trial court disregarded critical evidence.

The statement of decision recites: "The issue presented at the administrative hearing required competent evidence from an expert witness, namely a qualified psychologist or psychiatrist." The statement addresses the testimony of the County's key mental health witness, Dr. Wolf, and finds that testimony insufficient to support the County's decision. The trial court mischaracterized Dr. Wolf's testimony and reports, and disregarded other evidence in the record which bolstered his conclusions.

First, Sager's fitness for duty did not have to be shown entirely by testimony of a *mental health expert.* Two *police* experts found that she was unfit for duty due to mental issues.

Yuba County Sheriff-Coroner Virginia Black had known Sager *for over 20 years*, and had been her watch commander many years ago, before Black was elected Sheriff-Coroner. Black opined that Sager was not mentally fit to work as a peace officer because she could not "be a team player, who is able to look at things abstractly and not take everything personally, not to be upset when one is criticized, and to work in a team environment."

Black lived not far from Sager and went to Sager's house when Sager tried to kill herself; Black insisted that Sager get mental health treatment; "People who attempt to take their own lives are . . . obviously not well-balanced." Although Black allowed Sager to return to work on the advice of Dr. Wolf, she had understood that advice to require that Sager attend counseling and give up her position as a resident deputy, so she could be closely supervised. However, "the pattern and the habits that Sharon has are life-long, and I was never convinced that she was going to change." Sager refused to go to counseling, although it would have cost her only $5 per session.

During the "Officer In Charge" incident, Sager told Black that she was quitting, and Black learned that Sager had turned in her identification. "I don't think she can do her job. She's too worried about doing everybody else's job and wondering what everybody else is doing and why she's not getting this and . . . she just gets too involved with everybody else and gets angry. Everything is about her." "It's always turmoil around her."

Undersheriff Steven Durfor, who had known and worked with Sager *for over 15 years*, including working as her supervisor, gave a similar opinion: Although Sager had good abilities, "there's a chronic, repeated demonstration of performance problems. Primarily, those problems stem towards . . . emotional control and anger management and interpersonal sensitivity in getting along with others, her peers, her supervisors; not being real flexible;

argumentative; those kinds of things." At a meeting with supervisors after Sager's suicide attempt the need to display these qualities was emphasized.

The County summarized Black's and Durfor's opinions, and the bases therefor, in its objections to the proposed statement of decision. However, the statement of decision omits all reference to this testimony and states that the issue is to be determined solely by mental health testimony. Although neither Black nor Durfor is a *mental health* expert, both had many years of expertise in local law enforcement and in particular in supervising other peace officers and they were experts on those subjects. Their opinions about Sager's fitness, and particularly the degree to which she was or was not able to work effectively with other members of the department, strongly supported the County's decision, and dovetailed with Dr. Wolf's opinion.

Second, the statement of decision's description of Dr. Wolf's opinion, as reflected by his testimony and written reports, is too limited and thus not accurate. The trial court was free to *disagree* with his opinion or *discredit* it, but it did not do either. The statement of decision explains:

"Dr. Wolf testified that when performing a fitness-for-duty evaluation he considers the requirements pursuant to Government Code section 1031(f) and POST standards.

"Dr. Wolf testified that he believed Petitioner had a personality disorder. He further stated that between 15 and 40 percent of police officers have personality disorders.

"When asked to identify a single essential job duty that Petitioner was unable to perform, Dr. Wolf answered, 'I think she was a fairly good deputy in terms of . . . police work.' [Record Citation.] He proceeded to describe her as untrustworthy. He believed she lied to Dr. Falzett about that fact that there were restrictions placed on her when she returned to work after the first fitness for duty. Dr. Wolf further believed, based on his subsequent review of a psychiatric report, that Petitioner also lied about a sexual relationship during his initial evaluation of her.

"The record is devoid of any factual bases for Dr. Wolf's conclusion that Petitioner is *substantially unable* to perform her usual job duties of a deputy sheriff.

"Petitioner was allowed to return to work as a patrol deputy following her attempted suicide in July 2000. The written performance evaluations [fn. omitted] do not demonstrate that Petitioner was unable to perform her job duties following her return to work [on] August 2, 2000. Petitioner's entire

history of performance reviews reflect that for 20 years prior to her attempted suicide, Petitioner was performing her job duties at an acceptable level.

"Respondent County presented no other competent evidence to support the position that Petitioner is presently substantially unable to perform her job duties as a result of an emotional or mental condition."

The above passage does not accurately characterize Dr. Wolf's opinion of Sager's qualifications. His testimony was that she did not possess the skills of anger management, ability to engage in teamwork, ability to accept criticism and ability to exercise sound judgment required of a peace officer. The isolated quotation from his cross-examination quoted by the trial court was taken out of context, as it was a response to Sager's counsel's question about which items on a written job description Dr. Wolf believed Sager could not perform. It was *not* his opinion that she was a good deputy, only that she had good technical abilities.

Dr. Wolf's final written report, introduced into evidence, reflects his opinion, based on an exhaustive review of her personnel record and other relevant documents, as well as psychological testing and personal interviews, that Sager displayed "several long standing work related patterns of behavior," including lack of emotional control, impulsivity, and inability to accept criticism, and she has refused to seek help for these problems. "She has been advised to go to counseling, following two previous fitness-for-duty evaluations, by two separate Police Psychologists [i.e., Dr. Wolf and Dr. Newton], and has not complied either time." Sager was able to perform some duties "especially those tasks that do not require interactions with other people."

Dr. Wolf listed various criteria for a personality disorder and explained how Sager met those criteria. He then added, "Deputy Sager matches all of these criteria. It is clear that Deputy Sager has a personality disorder. I'd rather not diagnose her formally. This must be painful enough to her as it is. *But, having a personality disorder, which [a]ffects one's personal and professional life, as does the case with Deputy Sager, indicates that she fits a criteria for having job-relevant psychopathology of Government Code 1031.*" (Original italics.) He later said it this way: "With regard to the POST criteria [Sager] has deficits that interfere with her peace officer functions in: Anger management; emotional control; stress and threat tolerance; acceptance of criticism; . . . teamwork; practical intelligence/decision making ability and objectivity tolerance. [¶] *Based on the number of deficits, Deputy Sager does not match the required behavioral criteria for maintaining Peace Officer powers.* [¶] . . . [¶] It is my opinion that Deputy Sager has job-relative psychopathology as defined by Government Code 1031, <u>and</u> that she does not

match the behavioral criteria used to determine if a person can be given or maintain Peace Officer powers. [¶] Deputy Sager is not fit for duty." (Original italics and underscoring.)

The trial court faulted Dr. Wolf because he "wrote in his report that he did not diagnose her formally using the DSM method," but it is clear he *did* diagnose Sager, but to spare her further stigma, he did not want to phrase his conclusion as a formal written diagnosis. The trial court also faulted Dr. Wolf because he testified many peace officers have personality disorders. But in context the tenor of this testimony was that many officers have personality disorders *which do not impair their job performance, unlike in Sager's case.* The trial court apparently misunderstood Dr. Wolf's testimony and reports when it asserted that the administrative record was "devoid" of evidence supporting Dr. Wolf's conclusion that Sager was unfit for duty.

III. <u>The trial court applied the wrong substantive standard.</u>

■ " 'Disability' and 'incapacity for performance of duty' as a basis of retirement, mean disability of permanent or extended and uncertain duration . . . ." (Gov. Code, § 20026.) Sager concedes the following test generally applies: "[T]o be 'incapacitated for the performance of duty' within [a prior statute] means the *substantial* inability of the applicant to perform his usual duties." (*Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873, 876 [86 Cal.Rptr. 450], original italics; see *Hosford v. Board of Administration* (1978) 77 Cal.App.3d 854, 859–860 [143 Cal.Rptr. 760].)

The trial court faulted Dr. Wolf for not pointing to a particular duty listed on the relevant job description. Instead, Dr. Wolf addressed POST (Peace Officer Standards and Training) standards and Government Code section 1031 (section 1031). The trial court was not inclined to allow those standards to expand the necessary job duties, but concluded that even if they did, it would make no difference.

■ The trial court was mistaken on both counts. As we explain, section 1031 applied *as a matter of law* to Sager's fitness, and the POST standards were conceded to be relevant by Dr. Falzett. In fact, they are incorporated into Sager's job description, and therefore her ability to comply with them forms an important part of her "usual" duties.

Section 1031 provides in relevant part as follows:

"Each class of public officers or employees declared by law to be peace officers shall meet all of the following minimum standards:

"(a) Be a citizen . . . .

"(b) Be at least 18 years of age.

"(c) Be fingerprinted . . . .

"(d) Be of good moral character . . . .

"(e) Be a high school graduate [or equivalent] . . . .

"(f) Be found to be free from any physical, emotional, or mental condition that might adversely affect the exercise of the powers of a peace officer.

"(1) Physical condition shall be evaluated by a licensed physician and surgeon.

"(2) Emotional and mental condition shall be evaluated by either of the following:

"(A) A physician [with certain experience].

"(B) A psychologist [with certain experience].

"The physician and surgeon or psychologist shall also have met any applicable education and training procedures set forth by the California Commission on Peace Officer Standards and Training designed for the conduct of preemployment psychological screening of peace officers.

"(g) This section shall not be construed to preclude the adoption of additional or higher standards . . . ."

There are two features of this statute worth noting. First, subdivision (f) requires a peace officer to be "free from any physical, emotional, or mental condition that *might* adversely affect the exercise of the powers of a peace officer." (Italics added.) Second, the professionals who make that determination "shall also have met any applicable education and training procedures set forth by [POST] designed for the conduct of preemployment psychological screening of peace officers." (§ 1031, subd. (f).) Thus, Dr. Wolf's opinion that section 1031 embraced POST standards is confirmed by the fact that section 1031 evaluators must have been trained on POST standards.

Sager's position is that the section 1031 standards are relevant to and only to whether a person should be given peace officer status, either because she or he is a new candidate or has had a gap in service and wishes to return to

being a peace officer. (Citing *County of Riverside v. Superior Court* (2002) 27 Cal.4th 793 [118 Cal.Rptr.2d 167, 42 P.3d 1034]; *Pitts v. City of Sacramento* (2006) 138 Cal.App.4th 853 [41 Cal.Rptr.3d 838] (*Pitts*).)

█ We agree that the statute applies in those two cases, but the section 1031 standards must also be maintained throughout a peace officer's career. Section 1031 reflects a *minimum* set of standards for allowing a new recruit to become a peace officer and it would be illogical to conclude the Legislature believed those standards disappeared once an officer began working. The first sentence of section 1031 provides: "Each class of public officers or employees declared by law to be peace officers shall meet all of the following minimum standards . . . ." It does not say "each candidate" must meet the standards, it requires every "class" of peace officers, that is, every peace officer in California, to meet those standards. At least two of the standards reflect fundamental law enforcement qualifications: good moral character (§ 1031, subd. (d)) and mental fitness (§ 1031, subd. (f)). If Sager's position is correct, an officer who lost his or her moral compass would be immune from these standards and only subject to a moral character standard if the applicable job description in that department reiterated that standard as a defined duty of that classification of officers. That absurd result highlights the flaw in Sager's position.

One of the cases Sager cites confirms our view in part: "A public agency must enforce the criteria for peace officers in Government Code section 1031 at the time of hire, prior to a transfer between agencies, and also possibly when an employee changes positions within the same agency. [Citation.] *Moreover, peace officers must certify compliance with the criteria that the* [*POST*] *promulgates* [citations] *both as a matter of continuing education* and after a break in active status." (*Pitts, supra,* 138 Cal.App.4th at p. 857, fn. 4, italics added.)

Thus, the POST standards, which flesh out the section 1031 standards, are "a matter of continuing education." In our view the section 1031 standards are incorporated by law into every peace officer's job description.

Sager may be able to serve warrants, drive a patrol car and do many of the other tasks listed on her "class specification" job description, as she asserts, but if the evidence shows she is not able to maintain *mental fitness*, that is, control her anger, work with other officers, and make sound judgments, then she is not performing the duties described above *in the proper manner*.

Dr. Wolf's report explains that the section 1031 criteria are vague and that he also used criteria set by POST, including anger management, emotional

control, acceptance of criticism, interpersonal sensitivity, and teamwork. He opined that Sager has so many deficits in these areas that she cannot exercise peace officer powers.

When *Dr. Falzett* was asked, "Do you know whether or not POST sets forth standards that are to be followed by evaluators when determining whether an individual is fit for duty?" he answered: "Yes. As far as my—they do, yeah"; and he further testified that *he had reviewed the POST standards in forming his opinion about Sager.* Dr. Falzett agreed that it was important for peace officers to have emotional control, good judgment, anger management skills, and be able to work as a member of a team, the POST criteria described by Dr. Wolf. Dr. Falzett disagreed about whether Sager met the POST standards, *but he did not dispute their applicability.* Further, Sheriff Black testified that a deputy must be "free from mental and emotional conditions that might affect her job," and Undersheriff Durfor testified a deputy sheriff III had to be able to control anger and emotions, "accept criticism from supervisors in a constructive way" and be able to work as a team.

The trial court thus had no basis on this record to reject application of the POST standards, because all of the relevant evidence showed that they were relevant to Sager's job duties.

Further, as the County's decision notes, Sager's job description dovetails with section 1031 and the POST standards, requiring skill in "Remaining calm and taking appropriate action in difficult situations" and in "Exercising sound independent judgment within procedural guidelines." Indeed, her job description states in part that she must have "Strength, stamina and other psychical and psychological characteristics to meet P.O.S.T. standards." Thus, even under Sager's view that section 1031 and POST do not *necessarily* define a peace officer's duties, *they do in her case because her job description incorporates those standards.*

Finally, the trial court's statement of decision requires actual rather than potential harm to the public. The County claimed that *because of the nature of Sager's disability,* specifically, lack of good judgment and inability to manage her anger and impulsivity, there was a risk of harm to the public. The County supported this claim by analogizing to employee discipline cases, which state that the employer is not required to wait until harm occurs, particularly in the law enforcement context.

The gist of those cases is that because of the nature of peace officer organizations, in which officers must rely on each other during life-threatening situations, they must possess personal qualities conducive to

building trust and cooperation. (See *Gray v. County of Tulare* (1995) 32 Cal.App.4th 1079, 1092 [38 Cal.Rptr.2d 317] [former sheriff, testifying as an expert, "described law enforcement agencies as essentially paramilitary organizations in which discipline and loyalty are especially important"]; *Thompson v. State Personnel Bd.* (1988) 201 Cal.App.3d 423, 430 [247 Cal.Rptr. 210] ["A correctional officer must be able to maintain self-control"]; *Anderson v. State Personnel Bd.* (1987) 194 Cal.App.3d 761, 769, 771–772 [239 Cal.Rptr. 824] [officer's conduct "undermined the effectiveness of his relations with fellow officers"]; *Gray v. State Personnel Bd.* (1985) 166 Cal.App.3d 1229, 1233 [213 Cal.Rptr. 5] [testimony "that the ability to make calm, reasoned judgments under pressure was required of correctional officers"].)

■ The statement of decision states that the County *failed to demonstrate* "harm to the public service." This misses the point of the cases, which are discipline, not disability cases. The County *should not have to wait until harm occurs* before taking action to have Sager retired due to her mental disability. It is not the appropriate public policy to wait until Sager *actually* shoots the other woman in the courtroom, kills herself on duty, overreacts to a perceived threat or loses her temper in a dangerous situation to conclude that she is mentally unfit for duty.

### IV. Remand would be an idle act

In this case application of the correct test to the facts in the record admits of only one conclusion: Sager failed to carry *her burden* to prove that the County's decision, with its *strong presumption* of correctness, is not supported by the evidence. (*Fukuda, supra*, 20 Cal.4th at pp. 817–820, 824.)

We reiterate that the trial court did not reject the County's evidence, such as by not believing Dr. Wolf's opinion. The trial court's statement of decision recites that the ultimate conclusion is based on the lack of *any* evidence supporting the County's decision.

Because there was abundant evidence supporting the County's decision, remand would be an idle act. (See *Mason, supra*, 89 Cal.App.4th at p. 1131 ["the trial court was required to give considerable deference to the technical expertise of the administrative officers and experts, as well as to the administrative judge's decision, which was supported by detailed findings"].) Even where there is a conflict among competent experts, that will not normally meet a petitioner's burden to show "that the administrative findings were contrary to the weight of the evidence." (See *id.* at p. 1138.) Here, there was abundant evidence to support the County's decision and application of the appropriate standard of review to the relevant evidence shows no basis upon which to sustain Sager's challenge to that decision.

## DISPOSITION

The judgment is reversed and the trial court is directed to deny Sager's petition. Sager shall pay the County's costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)

Nicholson, Acting P. J., and Cantil-Sakauye, J., concurred.