[No. A129971. First Dist., Div. Five. Aug. 8, 2011.]

AURORA S.A., Plaintiff and Appellant, v.
STEVE POIZNER, as Insurance Commissioner, etc., Defendant and
Respondent.

COUNSEL

Dewey & LeBoeuf, Aldo A. Badini, George E. Anhang and Alan Salpeter for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Joyce E. Hee and Anne Michelle Burr, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**JONES, P. J.**—Aurora S.A. appeals from a judgment denying its petition for writ of mandate. (Code Civ. Proc., § 1085.) Aurora S.A. contends the trial court erred when it ruled California's Insurance Commissioner correctly declined to approve its sale of an insurance company to a different insurance company. We conclude the court's ruling is well supported and will affirm.

I. *Factual and Procedural Background*

The dispute in this case is yet another aspect of the dizzyingly complex and heavily litigated failure of the Executive Life Insurance Company (ELIC).[1]

In 1991, ELIC failed. California's Insurance Commissioner (the Commissioner) was appointed the conservator of the ELIC estate, and as conservator, the Commissioner oversaw the sale of the estate's assets. The MAAF Group, a consortium of French and Swiss insurers, and Altus S.A., an entity controlled by the French government, jointly submitted the winning bid.

Thereafter, pursuant to a contract entered into between the Commissioner and the Altus S.A./MAAF Group, ELIC's insurance policies were transferred to a new insurance company, Aurora National Life Assurance Company (Aurora), a subsidiary of New California Life Holdings (NCLH), which was controlled by the MAAF Group. In 1992, California's Department of Insurance (DOI) issued a certificate allowing Aurora to operate as a life insurance company in California.

In December 1992, Altus S.A. and a man named Francois Pinault form-ed a joint venture known as Artemis S.A. With the Commissioner's approval,

---

[1] See *California v. Altus Finance S.A.* (9th Cir. 2008) 540 F.3d 992, 995, footnote 3 and page 998, footnote 6, listing 15 different opinions in the state and federal courts that address various aspects of the ELIC litigation.

Artemis S.A. acquired a controlling interest in NCLH from the Altus S.A./MAAF Group. It is not clear when the relationship between Artemis S.A. and Aurora devolved to its current status, but one thing is apparent. Artemis S.A. does not directly own Aurora. Rather, Aurora is owned by NCLH, which is controlled by appellant Aurora S.A., which is controlled by Artemis S.A. Thus, to sum up and from the top down, Artemis S.A. is the parent of Aurora S.A. Aurora S.A. owns a controlling interest[2] in NCLH. NCLH owns 100 percent of Aurora.

According to a recent decision of the Ninth Circuit Court of Appeals, the Altus S.A./MAAF Group and Artemis S.A. both took actions that were highly questionable in connection with Aurora. Insurance Code section 699.5[3] places restrictions on the ability of entities controlled by foreign governments to own insurance companies in California and the Altus S.A./MAAF Group conspired to evade those restrictions. (*California v. Altus Finance S.A., supra,* 540 F.3d at p. 997.) In addition, the Altus S.A./MAAF Group conspired to operate NCLH (the holding company that owns Aurora) for the benefit of Altus S.A. and not it members. (*Ibid.*) In 1992 or 1993, Artemis S.A. learned about the Altus S.A./MAAF Group conspiracy but failed to disclose it to the Commissioner. (*Id.* at p. 998.) Instead, Artemis S.A. repeatedly submitted documentation to the DOI that contained false and misleading information. (*Ibid.*)

In 2000, Aurora S.A. and the predecessor of AIG Retirement Services, Inc., agreed to sell their interest in NCLH to Reassure America Life Insurance Company (REALIC).[4] The purchase agreement provided that either party could exercise its rights under the agreement but that the Commissioner had to approve the sale. The agreement also stated it would terminate if neither party had exercised its rights within 15 years. As part of the agreement, the parties entered into a reinsurance agreement pursuant to which Aurora ceded to REALIC 95 percent of the liabilities from all insurance policies, annuity contracts and guaranteed investment contracts that had been issued, reinsured or assumed by Aurora in exchange for 95 percent of the profits generated from Aurora's operations.

In 1999, the Commissioner learned of the Altus S.A./MAAF Group conspiracy and then filed suits against Altus S.A., the MAAF Group, Artemis S.A., Aurora S.A., NCLH, and Pinault. Among those who would benefit from the litigation were the former ELIC policyholders who were now

---

[2] Aurora S.A. does not own all of NCLH. It owned 67 percent of the outstanding stock of NCLH. The remaining 33 percent is owned by AIG Retirement Services, Inc.

[3] Unless otherwise indicated, all further statutory references are to the Insurance Code.

[4] REALIC is a wholly owned subsidiary of Swiss Reinsurance Company (Swiss Re), one of the largest insurance companies in the world.

Aurora policyholders. REALIC estimated that the "vast majority (likely over 99%) of Aurora's current policyholders were policyholders of Executive Life prior to its rehabilitation" and that "approximately two-thirds of Aurora's policyholders would receive funds recovered from the Artemis litigation . . . ."

The suits against all the defendants except Artemis S.A. and Pinault were either settled or dismissed and a trial as to those two was conducted in federal court in the Central District of California in 2005. After a nine-week jury trial, the jurors found Artemis S.A. liable for engaging in a conspiracy and awarded $0 compensatory damages but $700 million in punitive damages. The trial court then adjudicated certain equitable claims that had been made by the Commissioner and awarded $241 million in restitution.

The resulting judgment was appealed and Artemis S.A. moved for an order staying execution of the judgment while the appeal was pending. Artemis S.A. stated it would be receiving $227,805,874 from its sale of NCLH (and thus Aurora) to REALIC and it offered to place $55 million of that amount into an account that could be used to satisfy the judgment. The trial court accepted that offer.

On August 25, 2008, a panel of the Ninth Circuit Court of Appeals issued its opinion ruling the punitive damage award could not stand because it was not supported by any underlying compensatory damages. (*California v. Altus Finance S.A., supra,* 540 F.3d at pp. 1000–1004.) The court also vacated the $241 million restitution award because the trial court's determination of that amount had been based, in part, on the jury's award of damages. (*Id.* at p. 1009.) However, noting the jurors had found Artemis S.A. to be liable, the court remanded the case for a new trial on the issue of damages. (*Id.* at pp. 1005, 1011.) The court stated specifically that the trial court could reinstate the restitution award if warranted. (*Id.* at p. 1011.)

Artemis S.A. moved to vacate the order that restricted how it could use the money it would earn from the sale of NCLH (and thus Aurora), to REALIC. The federal court granted that request.

On September 18, 2008, i.e., less than one month after the Ninth Circuit issued its decision, REALIC filed its "Form A" application asking the Commissioner to approve its purchase of Aurora from Aurora S.A.

The Commissioner normally must approve or deny a Form A application within 60 days. (§ 1215.2, subd. (d).) REALIC waived that requirement and the Commissioner then embarked on a lengthy process to determine whether he should approve REALIC's request. Not all aspects of that evaluation went smoothly. In numerous communications with the Commissioner over the next year, REALIC clarified and supplemented its Form A application. On February 17, 2009, Arlene Joyce, staff counsel for the DOI, told Bill Marcoux, an attorney for Aurora S.A., that "financial issues" with Aurora had arisen. Then in March 2009, Joyce told Marcoux that "evaluations of current operations" had resulted in "adverse comments" and that some of the changes being proposed in the Form A application raised "financial questions."

Contemporaneously and importantly for purposes of the present appeal, it appears that since mid-January 2009 Joyce and Marcoux had been discussing whether it would be appropriate to place some or all of the money Aurora S.A. would receive from the sale of Aurora into an escrow that could be used to pay any judgment that the Commissioner might obtain in the federal court litigation. On June 8, 2009, in a memorandum that is described as being "for settlement discussion only" Marcoux stated that Aurora S.A. would place 50 percent of the proceeds it would receive from the sale of Aurora into an escrow that could be used as "prejudgment security." Aurora S.A.'s parent, Artemis S.A., threatened dire consequences if the Commissioner would not agree to the proposal. On August 26, 2009, an attorney for Artemis S.A. called an attorney who was representing the Commissioner and stated that "if the Commissioner would not agree to Artemis's proposal, a legal action would be commenced against the Department of Insurance to compel the Swiss Re transaction to be approved without any escrow or other conditions. He also indicated that, if that action were successful, the complicated corporate structure of Aurora and Artemis, combined with the difficulties of enforcing an American judgment in France, would make it virtually impossible for the Commissioner to recover any of the money that Artemis would receive, as a result of its ownership of Aurora S.A., from the Swiss Re sale if the Commissioner prevailed in the Action."

Despite these threats, the Commissioner was unmoved. On September 23, 2009, a representative from the DOI told Marcoux that the Commissioner stood by his request that 100 percent of the sale proceeds be placed in escrow and that the Commissioner planned to advise REALIC that its Form A request would be denied because "in seeking approval for the [a]cquisition, REALIC was putting its interests ahead of the interest of [Aurora] policyholders . . . ."

That same date, Arlene Joyce sent an e-mail to a representative from REALIC stating that the DOI "intends to deny the pending Form A application unless 100% of the Artemis sale proceeds are deposited in an escrow account satisfactory to the Commissioner. It is our understanding that Artemis refuses to agree to place 100% of its sale proceeds into escrow. Therefore, we are in the process of preparing a denial letter."

Less than a month later on October 14, 2009, Aurora S.A. repugned the Commissioner's escrow demand, filing the action that is at issue in the current appeal. Framed as a petition for writ of mandate and complaint for declaratory and injunctive relief, Aurora S.A. sought to compel the Commissioner to issue a decision on REALIC's Form A application.

On November 23, 2009, the Commissioner issued his formal decision disapproving REALIC's request to purchase Aurora.

After the Commissioner issued his decision, Aurora S.A. filed an amended petition alleging the Commissioner abused his discretion when he denied REALIC's Form A application.

The trial court considered Aurora S.A.'s petition at a hearing on July 22, 2010. The court ruled the Commissioner did not abuse his discretion and entered an order denying Aurora S.A.'s petition.

This appeal followed.[5]

II. *Discussion*[6]

Aurora S.A. contends the trial court erred when it approved the Commissioner's decision to deny REALIC's Form A application.

A writ of traditional mandamus under Code of Civil Procedure section 1085 can be used to review the administrative decisions of a public agency. (*Schwartz v. Poizner* (2010) 187 Cal.App.4th 592, 596 [113 Cal.Rptr.3d

---

[5] Aurora S.A.'s petition contained three causes of action and the trial court only ruled on one of them—the petition for writ of mandate. We nonetheless find the order to be appealable because, as the Commissioner contends, and Aurora S.A. does not dispute, the court's decision also resolved all outstanding issues in the declaratory relief and injunctive causes of action. (Cf. *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 698–700 [107 Cal.Rptr.2d 149, 23 P.3d 43].)

[6] On January 24, 2011, while this case was being briefed, Aurora S.A. filed a request asking this court to take judicial notice of several documents that are contained in the record on appeal. We deferred ruling on the request and told the parties we would consider it together with the merits of the appeal. Having now considered the request, we grant it.

610].) The trial court reviews the challenged administrative action to determine whether it was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices the law requires. (*Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 463 [116 Cal.Rptr.3d 883].) On appeal, the trial court's factual findings must be upheld if they are supported by substantial evidence. (*Ibid.*) However, legal issues present a question of law that this court reviews de novo on appeal. (*Ibid.*) With these principles in mind, we turn to the specific arguments presented.

■ Section 1215.2 grants the Commissioner the right to determine whether a person or entity should be permitted to purchase an insurance company that operates in California. As is relevant here, section 1215.2, subdivision (d) states that the Commissioner may disapprove the sale or purchase of a California insurance company if the commissioner finds any of the following:

"(1) After the change of control the domestic insurer . . . could not satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed. [¶] . . . [¶]

"(4) The plans or proposals which the acquiring person has . . . to make any . . . major change in its business or corporate structure or management, are not fair and reasonable to policyholders.

"(5) The competence, experience, and integrity of those persons who would control the operation of the insurer indicate that it would not be in the interest of policyholders, or the public to permit them to do so."

The commissioner relied on each of these subdivisions when denying REALIC's Form A request to purchase Aurora. First, citing section 1215.2, subdivision (d)(5) the Commissioner stated that REALIC's "attempt to conclude the [Aurora] acquisition prior to resolution of the ELIC litigation undermines its integrity." Second, again citing section 1215.2, subdivision (d)(5), the Commissioner stated that REALIC's practice of withholding benefits to Aurora policyholders when an overpayment had been made even if the benefits withheld far surpassed the overpayments demonstrated a lack of competence and integrity. Third, citing section 1215.2, subdivision (d)(4), the Commissioner stated that REALIC's plan to lift dividend restrictions that had been put in place to protect the value of Aurora for Aurora's policyholders

constituted a major change in its business operations that was not fair or reasonable to the Aurora policyholders. Fourth, citing section 1215.2, subdivision (d)(1), the Commissioner stated REALIC's actions indicated it lacked character and integrity to such a degree that it could not meet the requirements to qualify for a license to operate an insurance company.

The basic question we must answer is whether the Commissioner abused his discretion when he rejected REALIC's Form A application.

The Commissioner stated that each of the grounds he cited provided a separate and independent reason for rejecting REALIC's request. We turn then to the first ground the Commissioner cited: REALIC's lack of integrity. The Commissioner explained his decision on this point as follows:

"[Section 1215.2, subdivision (d)(5)] requires the Commissioner, in evaluating an application, to consider the competence, experience and integrity of those persons who would control the operations of the acquired insurer and authorizes disapproval of the application if the Commissioner determines that the acquisition would not be in the best interests of policyholders or the public. In this case, the public includes the ELIC policyholders and the state guaranty associations. [¶] . . . [¶]

"Applicant is aware that the Commissioner is the ELIC receiver with fiduciary obligations to the ELIC policyholders. Applicant is also aware that virtually all of Aurora's policyholders are former ELIC policyholders and will share in any damage award against Artemis in the pending ELIC litigation. Further, Applicant is aware of the liability findings against Artemis, the pending retrial, and that a sale of Aurora prior to conclusion of the litigation would permit Artemis to move the sale proceeds to France, greatly diminishing the prospects and increasing the costs of collecting on a judgment.

"Under these circumstances, the timing of Applicant's attempted exercise of its option to close the transaction raises serious questions. Applicant *already enjoys* most of the economic benefits of ownership and operational control of Aurora and has enjoyed those benefits since 2000. By insisting on exercising its option to complete the purchase of Aurora prior to conclusion of the ELIC litigation, Applicant disregards the interests of the Aurora policyholders and subordinates their interests to its own, thereby undermining its integrity as related to the proposed transaction."

We believe the Commissioner's analysis of this issue was both reasonable and supported by the record before him. As the Commissioner stated, virtually all of Aurora's current policyholders are former ELIC policyholders and the majority of those would benefit from any damages that might

be awarded in the ELIC litigation. But by choosing to go forward with the transaction when it did, REALIC put the interests of the Aurora policyholders in serious jeopardy. A sale of Aurora prior to the conclusion of the ELIC litigation would allow Artemis S.A. to move the sale proceeds to France where they would be difficult if not impossible to reach. Indeed, an attorney representing Artemis S.A. threatened to do just that. He told an attorney representing the Commissioner that the complex corporate structure of Aurora S.A. and Artemis S.A., combined with the difficulties of enforcing an American judgment in France, would make it virtually impossible for the Commissioner to recover any of the money that Artemis S.A. would receive from the sale of Aurora. Furthermore, as the Commissioner noted, REALIC already enjoys most of the economic benefit of owning Aurora as a result of its agreements with Aurora S.A. Under these circumstances, the Commissioner reasonably could conclude that by choosing to go forward with its purchase of Aurora when it did, and by putting its own interests ahead of the policyholders whom it hoped to represent, REALIC demonstrated that it lacked the integrity that is necessary in order to operate an insurance company in California. We conclude the Commissioner did not abuse his discretion when he rejected REALIC's Form A application on this ground.[7]

Aurora S.A. advances a host of arguments in an effort to demonstrate that the Commissioner abused his discretion. We conclude none of them is persuasive.

■ First, Aurora S.A. argues that the factors cited by the Commissioner in his formal decision were not the true reason why he rejected REALIC's Form A application and that "the Commissioner's decision . . . had nothing whatsoever to do with any characteristic of REALIC." Rather, the true reason the Commissioner rejected REALIC's application was the one identified in the September 23, 2009 e-mail from Arlene Joyce to a representative from REALIC: that the DOI would deny REALIC's Form A application "unless 100% of the Artemis sale proceeds are deposited in an escrow account satisfactory to the Commissioner." According to Aurora S.A., the Commissioner could not validly rely on that reason because it is not one that is set forth in section 1215.2, subdivision (d). (See *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1042 [56 Cal.Rptr.2d 109, 920 P.2d 1314].) We reject this argument because it fails to take into account the applicable standard of review. Whether the Commissioner's reasons for denying REALIC's request were the ones set forth in his formal decision or some other unstated reason is a question of fact, and the trial court's conclusions on questions of fact must be affirmed if they are supported by

---

[7] Since the Commissioner stated expressly that each of the four grounds he cited provided a separate and independent reason for rejecting REALIC's Form A application, we need not discuss whether any of the other grounds the Commissioner cited also support his decision.

substantial evidence. (*Shelden v. Marin County Employees' Retirement Assn., supra*, 189 Cal.App.4th at p. 463; see also *Sullivan v. Calistoga Joint Unified School Dist.* (1991) 228 Cal.App.3d 1313, 1317 [279 Cal.Rptr. 529].) Here, the trial court's implied conclusion that the Commissioner's decision was motivated by the reasons he set forth in his formal denial is supported by substantial evidence and therefore is binding on appeal.

Furthermore, we fully agree with the trial court's implied conclusion on this point. There certainly is nothing wrong with the Commissioner trying to protect the former ELIC now Aurora policyholders by seeking to establish an escrow account. The Commissioner is the conservator of the ELIC estate and as conservator, he is required to protect the interests of those policyholders. (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 356 [38 Cal.Rptr.2d 453].) As for the September 23, 2009 e-mail, Joyce does state that the DOI would deny REALIC's Form A application "unless 100% of the Artemis sale proceeds are deposited in an escrow account . . . ." But we see nothing inappropriate in that statement. Joyce was simply repeating the same point she had been making for nine months: that the Commissioner intended to protect Aurora's policyholders. While Joyce did not go on to frame her statement in the language of the controlling statute, *that same day*, a representative from the DOI contacted Bill Marcoux who was representing Aurora S.A. and told him that the Form A application was being denied because "in seeking approval for the [a]cquisition, REALIC was putting its interests ahead of the interests of [Aurora] policyholders . . . ." The isolated e-mail upon which Aurora S.A. relies does not compel the conclusion that the Commissioner based his decision on an improper ground.

In a related argument, Aurora S.A. argues that the Commissioner's explanation that he was denying REALIC's request because it lacked integrity was a *"post-litigation"* justification for his action. It is true that the Commissioner formally denied REALIC's Form A application in November 2009,[8] after Aurora S.A. had filed suit in October 2009. But as we have just stated, in September 2009, well before Aurora S.A. filed suit, a representative from the DOI told a representative of Aurora S.A. that the Form A application was being denied because "in seeking approval for the [a]cquisition, REALIC was putting its interests ahead of the interests of [Aurora] policyholders . . . ." The Commissioner's decision cannot be accurately characterized as a *"post-litigation"* justification.

Next, Aurora S.A. argues the Commissioner's statement that he was trying to protect Aurora policyholders is undermined by a statement the Commissioner's attorney made during a hearing in federal court in July 2005. During that hearing, counsel told the court that "Artemis has had no role in the opera-

---

[8] The Commissioner subsequently amended his decision in April 2010.

tion of [Aurora] since 2000, and the company has already been sold to a subsidiary of Swiss Re. . . . *The policyholders have been protected already from anything more that Artemis can do.*" (Italics added.) Aurora S.A. argues that because the Commissioner, through counsel, has admitted that Aurora S.A. policyholders are protected, the Commissioner could not have been trying to protect those policyholders when he denied REALIC's Form A application. We reject this argument because it fails to take into account the timing of the statement upon which Aurora S.A. relies. While the attorney for the Commissioner may well have believed in July 2005 that the Aurora policyholders were protected from anything else that Artemis S.A. could do, four years later things had changed. In August 2009, counsel for Artemis S.A. threatened to take the money it would receive from the prospective sale of Aurora offshore to France where it would be shielded from any judgment. Counsel for the Commissioner cannot be faulted for failing to anticipate that four years later, counsel for Artemis S.A. would threaten that "the complicated corporate structure of Aurora and Artemis, combined with the difficulties of enforcing an American judgment in France, would make it virtually impossible for the Commissioner to recover any of the money that Artemis would receive, as a result of its ownership of Aurora S.A., from the Swiss Re sale if the Commissioner prevailed in the Action."

 Aurora S.A. argues next that the Commissioner's determination cannot stand because "he does not address the integrity of any individual REALIC officer or director." According to Aurora S.A., "[a]s a corporation, it stands to reason that REALIC's integrity is measured by the integrity of those who manage the company." We do not doubt that the integrity of those who manage a corporation can and should be an important factor in some situations, but the Commissioner is not required to evaluate the integrity of those individuals in every case under California's statutory scheme. While section 1215.2, subdivision (d)(5) states the Commissioner can decline to approve a sale or purchase if "[t]he competence, experience, and integrity of those *persons* who would control the operation of the insurer indicate that it would not be in the interest of policyholders . . ." (italics added), the term "persons" in the statute is defined to include a corporation (§ 1215, subd. (e)).[9] The Commissioner properly evaluated the integrity of the *corporation* that was seeking to purchase Aurora.

Aurora S.A. also argues the Commissioner's decision is vulnerable because "the Commissioner has not procured and may never procure any judgment

---

[9] As is relevant here, section 1215 states, "As used in this article, the following terms shall have the respective meanings hereinafter set forth . . . [¶] . . . [¶] (e) 'Person' is an individual, a corporation, a partnership, an association, a joint stock company, a business trust, an unincorporated organization, or any similar entity, or any combination thereof acting in concert."

against Artemis . . . ." It is true the Commissioner does not currently have a judgment against Artemis S.A. and that he might not succeed in obtaining a judgment in the future. But it is also true that a jury has found Artemis S.A. to be liable and that the case has been remanded for new trial on the issue of damages. The controlling statutory scheme grants the Commissioner the discretion to deny a sale when any of the conditions set forth in section 1215.2, subdivision (d) are present and we may overturn the Commissioner's decision only where he abused that discretion. (*Shelden v. Marin County Employees' Retirement Assn., supra*, 189 Cal.App.4th at p. 463.) We conclude the Commissioner did not abuse his discretion here even though a judgment against Artemis S.A. does not currently exist.

In a related argument, Aurora S.A. points out that the complicated corporate relationship between itself and Artemis S.A. would make it difficult for the Commissioner to satisfy a judgment against Artemis S.A. with the funds Aurora S.A. would receive as the result of its sale of Aurora. Again, we view this as a matter that falls within the scope of the Commissioner's discretion. It might be true that the complicated relationship between Artemis S.A. and Aurora S.A. would make it difficult for the Commissioner to obtain money from the Aurora sale to satisfy a potential judgment against Artemis S.A. However, those difficulties are not so great as to make the Commissioner's decision unreasonable. We conclude the Commissioner did not abuse his discretion even though he may well face a difficult task satisfying any judgment that he might obtain.

Next, Aurora S.A. complains that "when reaching his determination about the impact of the timing on REALIC's integrity, the Commissioner (and trial court) failed to consider that the Purchase Agreement contained a put right that would have allowed the sellers to force REALIC to file the Form A." While that is true, it is irrelevant. Nothing in the record indicates the sellers exercised their right to force REALIC to file the Form A application.

Finally, Aurora S.A. argues that the Commissioner's decision should be rejected because "[t]he proper forum for the Commissioner to request a pre-judgment security is [in federal] Court." Of course it would be proper for the Commissioner as a litigant in the federal court action to seek prejudgment security in that action. But the Commissioner is wearing more than one hat. As conservator of the ELIC estate he is obligated to protect the former ELIC (now Aurora) policyholders, and as Commissioner he is obligated under section 1215.2, subdivision (d) to determine whether REALIC should be allowed to purchase Aurora. We conclude the Commissioner did not err simply because his acts as ELIC conservator and as statutorily mandated evaluator under section 1215.2, subdivision (d) affected issues that could also properly be considered in the federal court litigation.

## III. *Disposition*

The judgment is affirmed.

Simons, J., and Needham, J., concurred.