Filed 4/15/14

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SUSAN WHITE, | B243471 c/w B244798 |
| Petitioner and Respondent, | (Los Angeles County Super. Ct. No. BC479507) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Respondents and Appellants. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, James C. Chalfant, Judge. The judgment and order are reversed and the matter is remanded with directions.

Office of the County Counsel, John F. Krattli, County Counsel, Joyce Aiello, Assistant County Counsel, and Julie A. Dixon, Deputy County Counsel; Hausman & Sosa, Jeffrey M. Hausman and Larry D. Stratton for Respondents and Appellants.

Green & Shinee and Audra C. Call for Petitioner and Respondent.

When an employee takes leave under the Family and Medical Leave Act (FMLA) (29 U.S.C. § 2601 et seq.), the employee is entitled to be restored to employment upon certification from the employee's health care provider that the employee is able to resume work.  The employer is not permitted to seek a second opinion regarding the employee's fitness for work prior to restoring the employee to employment.  The question presented by the instant case is whether, if the employer is not satisfied with the employee's health care provider's certification, the employer may restore the employee to work, but then seek its own evaluation of the employee's fitness for duty at its own expense.  We conclude that it may.  We therefore reverse the judgment in favor of the employee in the instant matter.

### FACTUAL AND PROCEDURAL BACKGROUND

1.      *Plaintiff's Employment*

Plaintiff Susan White is employed as a Senior District Attorney Investigator with the Los Angeles County District Attorney's Office (DA).[1]  The essential functions of her job include personally serving arrest warrants, making arrests, interrogating suspects, and booking prisoners.  The position requires peace officer status under Government Code section 1031.

---

[1]      White named various defendants in this case, including then District Attorney Steve Cooley and Chief of the DA's Bureau of Investigation, Dominick Rivetti.  As White sought injunctive relief, it is assumed she sued these individuals in their official capacities, although it is unclear, as she subsequently amended her complaint to seek damages as well.  White also named as defendants the DA's Bureau of Investigation and the County's Occupational Health Programs under its Risk Management Branch.  In their brief on appeal, defendants suggest that the real party in interest is actually the County of Los Angeles itself; White does not challenge this assertion, and simply refers to "Appellant" in the singular.

2.      *Plaintiff's Depression*

There is no real dispute that, beginning in late 2009, around the time of the death of her brother-in-law, White began experiencing emotional difficulties. She was observed acting erratically in the workplace, with very high emotional highs and very low lows.

In January 2010, White's supervisor, Terisa Carver, advised her own supervisor of the situation. Carver believed that, while none of the incidents alone established a problem, taken together, the incidents might be a precursor to a more serious issue. Carver also believed that White's behavior was a distraction to her co-workers, to the point where she chose to relocate White's office-mate.

On April 15, 2010, White was part of a team of investigators executing a search warrant. White and another investigator were guarding the perimeter of the location when they learned the entry team was unable to breech the front door. It was communicated that the team needed to locate an alternate entry point. Then, without any warning to the rest of the team, White jumped over a wrought iron fence and said, " 'Who's coming with me?' " This was a poor tactical decision which jeopardized White's own safety, as she placed herself in a position of potential cross fire from team members who were not aware of her change in position.

That same day, other investigators joked that White had been on medication for some time; they believed she might have psychological issues affecting her stability. Carver contacted White's prior supervisor; he told her that White had recently told him that she was having problems regulating her medications.

On April 21, 2010, White asked for the afternoon off, stating that her medicine was making her " 'feel stupid.' " The next day, Carver wrote a memo to Chief Rivetti documenting her concerns.

White had a meeting with some of her supervisors on May 6, 2010. After the meeting, her emotional behavior appeared to improve. However, Carver eventually came to believe that White was simply doing a better job at hiding her problems. White was observed crying, anxious, and having mood swings.

On June 16, 2010, tactical training was conducted. During the training White "did not make good tactical decisions, rushed movement, and appeared nervous." At one point, she tripped over a fellow investigator who was moving forward, and she was "continuously pointing her fake weapon at other team members." Carver privately spoke to White regarding her tactics and paying attention to directions.

On June 17, 2010, a search warrant was executed for which White was the investigating officer. Two other investigators planned to attempt a low key contact with the suspect, and the search team was to stand by and provide assistance only if requested. White was not part of the tactical team and was instructed to wait away from the location until she was notified. Instead, she suddenly left the staging area. While the other investigators contacted the suspect as planned, White drove down the street at a high rate of speed, used her vehicle's siren, parked in the middle of the street, and left her vehicle to back up the other investigators. During debriefing, when asked why she did not follow the plan, White stated that she activated the siren accidentally but her training had " 'kicked in' " with respect to backing up the other officers. She stated that

4

she had seen them with their guns drawn, a fact the other officers "emphatically denied." White was reminded that she needed to exercise discipline in following the plan. She appeared agitated and confused by the criticism.

On July 13, 2010, Carver met with White. Carver told White that she still had concerns regarding White's judgment in the last warrant, but advised White that she was making progress. Carver told White that it would take time to earn the trust and confidence of her peers, and that they were still somewhat skeptical about wanting to work with her. White said that her peers had valid reasons for their distrust. She said she knew she had extreme highs and described herself as a " 'whack job.' "

In February 2011, White requested a private meeting with Carver. In the meeting, she began crying and said she was worried about her family. White stated that her father told her that he was interested in buying a gun for protection. White stated that she knew that if her father purchased a gun, he would kill White's mother and himself. She admitted that no threats were made by her father and he never made any comments related to killing himself or White's mother. White believed, however, that this was his plan, as he was getting older, and if he wanted to purchase a gun, it must be for violence. She took time off for the rest of the day, stating she needed to leave early to care for family obligations. When Carver asked White about the situation the following week, she looked confused and downplayed it.

In February 2011, White was required to testify in a case regarding an investigation with which she had assisted while previously employed by the Cypress Police Department (the *Kim* case). After her initial testimony, White told Carver about

5

it, and began to cry, saying that a defense attorney was trying to attack her on the stand. White related to Carver that, when the attorney asked her why the testimony of some witnesses differed from hers, she angrily yelled at the attorney, " 'They are liars!' " White demonstrated this for Carver, and it was clear that White had lost her composure on the witness stand and appeared unprofessional.

In March 2011, White was called to testify again in the *Kim* case. The defense attorneys cross-examined White, and were able to demonstrate to the court that her testimony contained significant factual errors. The defense requested a mistrial, based on White's alleged perjured testimony, which was denied. As a result of her testimony, a personnel complaint was filed by the defense attorneys with the DA's office, alleging perjury and the filing of false reports.[2]

On April 26, 2011, White told Carver that she would be undergoing treatment for which she may need to take time off. White did not know how much time she would need to take off. She was crying and stated she was worried about getting fired. Carver advised her that her health was a priority.

3. *White's FMLA Leave*

Pursuant to the FMLA, an eligible employee is entitled to a total of 12 workweeks of leave because of a serious health condition that renders the employee unable to perform the functions of the employee's position. (29 U.S.C. § 2612(a)(1)(D).) The leave may be unpaid. (29 U.S.C. § 2612(c).)

---

[2] The Orange County District Attorney's Office concluded there was insufficient evidence to file criminal charges, but this would not prevent the DA, White's current employer, from conducting an internal investigation.

On May 3, 2011, White informed Carver that she would need to take one month off work, starting on May 5. She began crying and stated that she needed to get better. She said she would be in the hospital for two weeks, followed by two weeks of outpatient treatment. Carver told White she would give her the necessary FMLA paperwork. Carver then passed the information on to the DA's FMLA coordinator, who provided her with the paperwork.

On May 4, White stated that she was having problems receiving approval for her treatment from her insurance carrier, and her treatment would be delayed. On May 16, 2011, White faxed Carver a letter from her psychiatrist, Dirk de Brito, M.D. Dr. de Brito sought leave for White from May 16 to June 20, for treatment.[3]

On May 13, 2011, Dr. de Brito completed a "Certification of Health Care Provider" form. His certification explained that White is "severely depressed despite medications." He added, "very high functioning baseline, excellent prognosis after treatment." In the form, Dr. de Brito was asked for the approximate date White's condition commenced; he wrote "Approx 4/2011." He was asked for the probable duration of the condition; he wrote "6 months but can work prior." He specifically indicated that White would be unable to perform her job functions only while

---

[3]     The letter does not state that White's medical condition rendered her unable to perform her job; instead, it states that continued work would interfere with her treatment. Curiously, the letter was dated May 2, 2011. The is no explanation for why de Brito believed, as early as May 2, 2011, that White's treatment would not begin until May 16, as White believed her treatment would begin on May 5 during the same time period.

undergoing treatment.[4]  The form asked, "Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions?"  Instead of checking "yes" or "no" on the form, Dr. de Brito wrote, "Unknown."  The form then asked, "Is it medically necessary for the employee to be absent from work during the flare-ups?"  Instead of checking "yes" or "no," Dr. de Brito wrote, "potentially."  The form was received by the DA on May 25, 2011.

On June 6, 2011, the DA approved White's FMLA request.  The approval indicated that White had the full 12 weeks of FMLA leave available, which would run through August 5, 2011.[5]  White's treatment took longer than expected.  Although Dr. de Brito had originally requested leave for White through June 20, 2011, he requested an extension of her leave to June 25, 2011.  On June 24, 2011, he again requested an extension of her leave, until July 25, 2011.[6]

As already noted, White's 12 weeks of FMLA leave  were to expire on August 5, 2011.  On August 2, 2011, Dr. de Brito wrote a letter seeking further leave for White until August 29, 2011.  He indicated that White would next be evaluated on August 22.

---

[4]    He estimated White's period of incapacity to be only from May 16 to May 30, 2011.  This was odd, as Dr. de Brito had requested leave for White from May 16 to June 20.

[5]    There is a place on the FMLA designation notice where the employer can mark a paragraph, indicating that the employee will be required to present a fitness-for-duty certification in order to be restored to employment.  The DA did not mark this paragraph.

[6]    At this time, Dr. de Brito expressly indicated that White's condition interfered with her ability to perform the essential functions of her job.

8

There is no dispute that, upon the expiration of White's FMLA leave, she was placed on unpaid, but authorized, medical leave. On August 18, 2011, Dr. de Brito wrote a final letter, representing that White would be able to return to work and perform her essential job functions on September 7, 2011.

4.    *White's Return to Work*

Under the FMLA, when an employee returns from FMLA leave, the employee is entitled to be restored to his or her position of employment or an equivalent position. (29 U.S.C. § 2614(a)(1).) If the employer has a uniformly applied practice or policy requiring it, the employer may require each employee taking FMLA leave to provide certification from the employee's health care provider that the employee is able to resume work.[7]  (29 U.S.C. § 2614(a)(4).)

On September 6, 2011, White was informed that she would be placed on paid administrative leave and reassigned to her home effective September 7, 2011.[8]  There is no dispute that White was restored to employment on September 7, 2011. Nor is it suggested that White was reassigned to her home for medical reasons. In White's brief on appeal, she admits that she was restored to full pay but placed on administrative suspension "for a separate investigation."

---

[7]    This provision also provides that it shall not supersede a valid state or local law or a collective bargaining agreement governing return to work. (29 U.S.C. § 2914(a)(4).) The parties dispute the applicability of this provision to the facts of this case. As we conclude that White was returned to employment upon Dr. de Brito's certification, this exception is irrelevant.

[8]    While White had been on leave, on May 26, 2011, the DA had relieved White of peace officer status so that it could conduct an administrative investigation into the allegations of criminal misconduct relating to her testimony in the *Kim* case.

9

5. *The DA Orders a Medical Reevaluation*

Los Angeles County Civil Service Rules, Rule 9.07, governs medical reevaluations of employees. An appointing authority may, with the consent of the director of personnel, require an employee to have a medical reevaluation. "The purpose of such reevaluation must be to determine the capacities of the employee to perform the duties of the employee's job satisfactorily and without undue hazard to the employee or others. Accordingly, such reevaluation shall be concerned only with the medical condition related to the satisfactory performance of the required duties or to the protection of the health, safety and welfare of the employee or others." (L.A. Cty. Civ. Service Rules, Rule 9.07(B).)

The director of personnel has designated its authority under this rule to the Occupational Health Programs (OHP) of the County. On December 7, 2011, the DA requested OHP to consent to requiring White to undergo a medical reevaluation. Dr. Sepideh Souris, the Chief of Psychological Services for OHP, reviewed the history of White's aberrant behavior, as well as her job requirements. After review, Dr. Souris consented to the DA's request for an order compelling White to attend a medical reevaluation. It is undisputed that the factual basis for this order was White's erratic conduct *prior* to her FMLA leave;[9] White was not ordered to be reevaluated because of anything that occurred while she was on leave,[10] or after she returned from leave.

---

[9] In her operative complaint, White alleges that she was directed to submit to the medical reevaluation "in connection with her FMLA leave." There is no evidence of this, and all of the evidence presented is to the contrary. The order directing White to

10

On January 17, 2012, White was ordered to appear for her medical reevaluation. The evaluation was to be performed on January 27, 2012 by a doctor at OHP, at County expense. White was informed that if she failed to appear, it may be cause for disciplinary action. White failed to appear for the reevaluation. On February 1, she was informed that her failure to appear was an act of insubordination that subjected her to discipline. Nonetheless, the DA was "willing to give [White] another chance to comply" with the order, and rescheduled her appointment for February 28, 2012. She was again informed that an unauthorized failure to appear may be cause for disciplinary action. White did not intend to appear, believing that the reevaluation was ordered in violation of her rights under the FMLA.

6. *The Instant Action*

On February 23, 2012, White filed the instant action, seeking injunctive relief or a writ of mandate prohibiting the DA from requiring her to appear for a medical

---

appear for a medical reevaluation stated only that the evaluation was sought in accordance with Los Angeles County Civil Service Rules, Rule 9.07.

[10] White was hospitalized while she was on leave. Dr. Sepideh noted that if the hospitalization had been *involuntary*, the Department of Justice would withdraw White's permission to possess a weapon. Dr. Sepideh did not know whether White's hospitalization had been voluntary or involuntary. The record gives rise to an inference that the hospitalization – which was deferred while White confirmed insurance coverage – was voluntary. Any inference to the contrary is purely speculative. In any event, this was a small part of the many reasons Dr. Sepideh gave for authorizing White's medical reevaluation; there is no suggestion in the record that it was critical to Dr. Sepideh's conclusion.

11

reevaluation or disciplining her for failing to appear.[11]  White did not seek to be restored to active duty; she sought only to prevent the medical reevaluation or any discipline for her failure to attend it.  She took the position that requiring her to perform the medical reevaluation violated her right under the FMLA to be restored to employment on her doctor's certification alone.  White did not allege that the medical reevaluation had violated any other federal or state law; she alleged only that the reevaluation order violated her restoration to employment right under the FMLA.

White initially obtained a temporary restraining order, preventing the reevaluation from proceeding.  The court then set the matter for a hearing on whether a preliminary injunction should issue.  The matter was fully briefed, and the court concluded that the balance of harms weighed in favor of issuing the preliminary injunction.  The court then set the matter for hearing on the petition for writ of mandate.  The matter was again briefed.

The court ultimately concluded that the DA would be legally permitted to order a medical reevaluation of White based on any conduct occurring *after* her return to work, but that her doctor's certification that she was fit for work upon her return from FMLA leave must be accepted as sufficient.  As the court explained at the hearing, "Nobody is disputing based on the facts of 2010, 2011 that Ms. White should be reevaluated.  The whole point of the [FMLA] is that she was[,] by her own psychologist."  A permanent injunction issued preventing the DA from requiring

---

[11]     White subsequently amended her complaint to seek damages under Civil Code section 52.1 for violating her civil rights.  When she prevailed on her cause of action for injunctive relief, she agreed to dismiss this cause of action.

12

a medical reevaluation of White based on her conduct prior to September 7, 2011, or from charging her with insubordination for failing to comply with the medical reevaluation. A writ of mandate also issued, in similar terms. The DA filed a timely notice of appeal. On motion, White was awarded $55,080 in attorney fees. The DA also filed a timely notice of appeal from the attorney fee award.

### *CONTENTIONS*

On appeal, the DA makes several arguments, including that: (1) any rights White may have had to return to work on only her own doctor's certification under the FMLA terminated when she failed to return to work when her 12 weeks of FMLA leave were completed; and (2) Los Angeles County Civil Service Rules, Rule 9.07, allowing the DA to order a medical reevaluation, is a local law governing return to work which supersedes the FMLA provisions.

After a careful review of this matter, we conclude that White was, in fact, returned to work on September 7, 2011. Thus, the FMLA requirements for return to work are simply not implicated by this case. This conclusion, however, raises the issue of whether, *after* an employee has been returned to work as required by the FMLA, the employer is prohibited by the FMLA from requiring a medical reevaluation related to the serious health condition for which the employee was granted FMLA leave. We conclude that it is not, even where such reevaluation involves matters existing prior to the FMLA leave.

13

## DISCUSSION

1.      *Standard of Review*

In reviewing a trial court's decision on a petition for writ of traditional mandate, we review legal issues de novo on appeal.  (*Aurora S.A. v. Poizner* (2011) 198 Cal.App.4th 1437, 1444.)

2.      *Interference with FMLA Rights*

White is pursuing a cause of action for interference with her FMLA rights. There are five elements for a prima facie case of interference with such rights.  The employee must establish "that:  (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.'  [Citation.]  We agree with this approach. In interference claims, the employer's intent is irrelevant to a determination of liability." (*Sanders v. City of Newport* (9th Cir. 2011) 657 F.3d 772, 778.)

There is no dispute in this case that the first four elements were established; the dispute surrounds whether the DA denied White FMLA benefits to which she was entitled.  The DA granted White the full 12 weeks of FMLA leave to which she was entitled.  The DA also reinstated White to employment, on the certification of Dr. de Brito, when she was ready to return.  The sole issue, then, is whether the order for a medical reevaluation, some four months after White's return to work, violated her rights under the FMLA.

14

3.    *There Is No FMLA Violation as a Matter of Law*

a.    *FMLA Return to Work Provisions*

The FMLA clearly provides that when an employee has completed FMLA leave, that employee is entitled to reinstatement upon certification by the employee's health care provider.  (29 U.S.C. § 2614(a)(4).)  While the FMLA permits an employer to require a second opinion (at the employer's expense) to determine whether the employee has a condition requiring FMLA leave (29 U.S.C. § 2613(c)), it does not permit the employer a second opinion prior to reinstating the employee.  Indeed, the implementing regulations expressly state that "[n]o second or third opinions on a fitness-for-duty certification may be required."  (29 C.F.R. § 825.312(b).)

The FMLA implementing regulations also state, however, that "[R]equirements under the Americans with Disabilities Act (ADA), as amended, apply.  After an employee returns from FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care provider be job-related and consistent with business necessity."  (29 C.F.R. § 825.312(h).)  The ADA provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  (42 U.S.C. § 12112(d)(4)(A).)

b.    *The Albert v. Runyon Opinion*

White takes the position that the FMLA provisions which guarantee an employee's return to work on the sole certification of the employee's own physician

15

would be undermined if the employer were permitted to require the employee, who had returned to work, to undergo a fitness for duty examination based on the precise medical condition for which the employee took leave (and was thereafter certified, by her own physician, as fit to return to work). This position was adopted by the federal district court in *Albert v. Runyon* (D. Mass. 1998) 6 F.Supp.2d 57 (*Albert*).

In *Albert*, the employee took FMLA leave due to clinical depression, and sought to return to work based on her doctor's certification. (*Albert, supra,* 6 F.Supp.2d at p. 59.) Her employer scheduled her for a fitness for duty examination (FFDE), and placed her on paid administrative leave pending the results of that examination.[12] (*Ibid.*) The employee refused the examination and brought suit, seeking to be restored to her prior job without the FFDE. (*Id.* at p. 61.) The employer argued that it could require the FFDE under its general policy or the ADA. The court disagreed, saying that to permit the examination would circumvent the protections of the FMLA. The court stated, "The requirement that an employee be returned to duty without delay upon the employer's receipt of fitness-for-duty certification would be nullified if the fact that an employee had taken leave under the FMLA for a temporarily, but no longer, disabling condition could be a sufficient reason to question her ability to work. This is not to suggest that an employer can never order a newly returned employee to undergo

---

[12]    The *Albert* court did not discuss whether placing the employee on paid administrative leave constituted returning the employee to work; it appears from the court's analysis that the court treated it as a failure to return the employee to work. We disagree with such reasoning. In any event, it is clear that White's placement on paid administrative suspension for an investigation into her misconduct constituted a return to work.

examination, but only that where, as here, an employee presents a medical certification that is adequate under the FMLA, and the employer has no present reason to doubt the employee's fitness for duty, the employer cannot rely on the employee's FMLA leave (or her prior medical condition) to justify such an examination." (*Id*. at p. 66.) In response to the employer's argument that the ADA permitted the FFDE, the court responded that there was "no logical reason that an examination which does not violate the ADA cannot violate the FMLA." (*Id*. at p. 67.) The court concluded that, in order for the FFDE to be permissible, there must be some business need for the FFDE independent of the employee's having taken FMLA leave. (*Id*. at p. 69.) More than that, the business need must be independent of the "underlying condition that the employee's health care provider has certified will not interfere with the employee's ability to work, or because the employer views the certification as inadequate for its own purposes." (*Ibid.*)

The *Albert* analysis was adopted by the district court in *Routes v. Henderson* (S.D. Ind. 1999) 58 F.Supp.2d 959 (*Routes*).[13] *Routes* is of little value to our analysis as it was clear that the employee in that case was never returned to work; indeed, his employment was ultimately terminated on the basis that he was on unpaid leave for more than one year (*id*. at p. 975), even though his physician had certified him to return

---

[13] The continued viability of *Routes* in its own district is in questionable. In *Harrell v. United States Postal Service* (7th Cir. 2006) 445 F.3d 913, 927, fn. 7, the Seventh Circuit Court of Appeal "respectfully disagree[d]" with *Routes*. As the Southern District of Indiana is within the Seventh Circuit, the Seventh Circuit's disagreement constitutes disapproval.

to work. What is significant about *Routes*, however, is the way in which it expounded upon the analysis of *Albert*.

The *Routes* court concluded that, once an employee had returned from FMLA leave based on an adequate medical certification from the employee's own doctor,[14] the employer could order a FFDE if: (1) the employee's *post-reinstatement* behavior warranted a FFDE; or (2) the employee's prior conduct *unrelated to the temporarily-disabling medical condition* warranted it. But the employer could not request a FFDE simply because its more-restrictive standards were not satisfied by the employee's doctor's certification. (*Routes, supra,* 58 F.Supp.2d at p. 996.)

        c.     *Albert Is Impliedly Rejected by the Department of Labor*

*Albert* and *Routes* predated a 2008 revision of the applicable regulations. Before the revision, the regulatory language indicating that the provisions of the ADA applied in FMLA cases was part of a subdivision discussing the return-to-work certification. It stated, in part, "If State or local law or the terms of a collective bargaining agreement govern an employee's return to work, those provisions shall be applied. Similarly, requirements under the Americans with Disabilities Act (ADA) that any return-to-work physical be job-related and consistent with business necessity apply." (29 C.F.R. fmr. § 825.310(b).) In 2008, the ADA language was moved to its own subdivision, which now states, "Requirements under the Americans with Disabilities Act (ADA), as amended, apply. After an employee returns from FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care provider

---

[14]      Again, the employee in *Routes* was not returned to work.

be job-related and consistent with business necessity." (29 C.F.R. § 825.312(h).) This latter sentence, discussing medical examinations *after* the return from FMLA leave, was not part of the former regulation.

In making this modification, the Department of Labor explained, "Based on the comments, it appears that both employers and employees are confused regarding the interaction between the ADA and the FMLA in relation to fitness-for-duty certifications. By moving the discussion to a separate paragraph . . . , the Department intends to make clear that, once an employee returns to work and is no longer on FMLA leave, an employer may require a medical exam under the guidelines and restrictions imposed by the ADA. At that point, the FMLA's fitness-for-duty regulation no longer applies." (73 Fed. Reg. 67934-01, 68036.) Thus, it is clear that the Department intended to clarify that a bright line exists at the employee's return to work. Before the return to work, the employer must accept the employee's physician's certification and return the employee to employment; after the return to employment, the FMLA protections no longer apply, and the employer may require a FFDE consistent with the ADA.

To the extent that *Albert* and *Routes* concluded that the FMLA imposed *any* limitation on a FFDE examination which could be required under the ADA for an employee who had been returned to work, those cases were implicitly rejected by this

19

modification of the regulation.[15]  Once an employee has been returned to work, "the

FMLA's fitness-for-duty regulation no longer applies."

### d.  *A Return to Work Certification Does Not Preclude A Finding of Unfitness for Duty*

There is a second reason we reject White's arguments based on *Albert* and

*Routes*.  Those cases take the position that a single health care provider's opinion (i.e.,

that of the employee's health care provider) that an employee can return to work from

a particular illness or disability is *conclusive*, and cannot subsequently be questioned by

the employer in a FFDE.  Public policy rebels at such a thought.  The FMLA itself

acknowledges that medical professionals can disagree on whether an employee's serious

health condition renders the employee unable to work; it provides for a second opinion

on whether an employee qualifies for FMLA leave (29 U.S.C. § 2613(c)) and a third

opinion if the first and second opinions are not in agreement (29 U.S.C. § 2614(d)).  As

such, it is unlikely that Congress intended an employee's health care provider's opinion

to be conclusive on the employee's fitness for work.  Instead, the FMLA should be

interpreted to render the employee's health care provider's opinion conclusive on the

issue of whether the employee should be immediately *returned to work*, but to permit

the employer to thereafter require a FFDE, if it has a basis to question the employee's

health care provider's opinion.

---

[15]  Again, we note that the *Albert* court stated that there was "no logical reason that an examination which does not violate the ADA cannot violate the FMLA."  (*Albert, supra,* 6 F.Supp.2d at p. 67.)  To the extent that the *Albert* court meant that a post-return-to-work medical examination that does not violate the ADA can nonetheless violate the FMLA, the Department of Labor has rejected this conclusion.

The 2008 comments to the Department of Labor's revision of the regulations support this interpretation. The Department of Labor stated, "An employer may not require that an employee submit to a medical exam by the employer's health care provider as a condition of returning to work. A medical examination at the employer's expense by an employer's health care provider may be required only after the employee has returned from FMLA leave and must be job-related and consistent with business necessity as required by the ADA. *Thus, if an employer is concerned about the health care provider's fitness-for-duty certification, the employer may, consistent with the ADA, require a medical exam at the employer's expense after the employee has returned to work from FMLA leave* as stated in paragraph (h) in the final rule. The employer cannot, however, delay the employee's return to work while arranging for and having the employee undergo a medical examination." (73 Fed. Reg. 67934-01, 68033 (emphasis added).) [16]

While our conclusion applies to all employees who have taken FMLA leave, it is particularly applicable to the instant case, where the employee was a peace officer, who

---

[16] On appeal, the parties did not brief the 2008 revision of the applicable regulations. We informed the parties of this authority and sought additional briefing. In response, White took the position that while a post-return-to-work examination which does not violate the ADA would be permitted, the medical reevaluation sought by the DA was not supported by a valid business necessity and therefore violated the ADA. White added that the DA never sought to justify the examination by relying on the ADA. White misconstrues the procedural posture of this case. She sought a writ of mandate precluding the examination on the sole basis that it violated her rights under the FMLA. The law is clear that it did not; she is therefore not entitled to a writ of mandate. That White was mistaken in her interpretation of the FMLA does not mean that she can raise a new basis for challenging the examination on appeal. In any event, as we discuss below, it certainly appears, on this record, that White's medical examination was justified by a business necessity.

carried a weapon. Under Government Code section 1031, a peace officer shall be "free from any physical, emotional, or mental condition that might adversely affect the exercise of the powers of a peace officer." (Gov. Code, § 1031, subd. (f).) These standards are part of every peace officer's job description, and must be maintained throughout a peace officer's career. (*Sager v. County of Yuba* (2007) 156 Cal.App.4th 1049, 1059.) Government Code section 1031 provides that a peace officer's mental and emotional condition is to evaluated by a psychiatrist or psychologist with five years' experience in the diagnosis and treatment of emotional and physical disorders, and who has met education and training procedures set forth by the California Commission on Peace Officer Standards and Training designed for the conduct of preemployment psychological screening of peace officers. (Gov. Code, § 1031, subd. (f)(2).) While a peace officer's health care provider may certify her as fit to return to work under the FMLA, that is no guarantee that the employee's health care provider meets the requirements of Government Code section 1031, in order to properly evaluate the peace officer's mental and emotional health requirements under that statute.[17]

Moreover, it is appropriate, and not in violation of the ADA, for a peace officer with mental health issues to be ordered to a FFDE.[18] It is unnecessary for the employer

---

[17] Indeed, in White's brief, she states that Dr. de Brito's certification satisfies Government Code section 1031, but there is no indication in the record that Dr. de Brito has the necessary experience or training to perform a Government Code section 1031 evaluation.

[18] White argues that there is no business necessity, as required under the ADA, for her FFDE, on the basis that there is no business necessity unless the FFDE could be justified by events which occurred after she returned from FMLA leave. White's

to establish that the employee's job performance has actually suffered in order to require a FFDE, when the employee in question is a peace officer who carries a weapon.[19] (*Brownfield v. City of Yakima* (9th Cir. 2010) 612 F.3d 1140, 1145-1147; cf. *Gordon v. United States Capitol Police* (D.D.C. 2013) 923 F.Supp.2d 112, 117 [when plaintiff's supervisor was concerned that plaintiff was experiencing severe depression while carrying a weapon, a legitimate basis existed for a FFDE].)

---

argument is more of a legal argument than a factual one. She does not argue that the acts which occurred prior to her FMLA leave did not give rise to a business necessity, nor does she suggest that the passage of time alone renders those events too old to be considered as justifying the medical evaluation. Instead, she argues that the fact that she went on FMLA leave, and was certified by her physician to return from FMLA leave, renders those events *off-limits* in terms of supporting a business necessity for a post-return-to-work evaluation. This is simply a restatement of the *Albert* and *Routes* line of reasoning which, as we have already concluded, was rejected in the 2008 amendment of the governing regulations. In any event, the argument is erroneous. If a business necessity exists which would permit an employer to order a medical evaluation under the ADA, the employee cannot *avoid* the evaluation by the simple expedient of going on FMLA leave and obtaining a medical certification that she may return to work. A certification that an employee may return to work from FMLA leave simply requires that the employee be restored to work; it does not erase all of the events which occurred before the employee went on FMLA leave.

[19] White suggests that our conclusion that post-FMLA leave medical examinations which do not violate the ADA are permissible when based on pre-FMLA leave conduct would swallow whole the FMLA return-to-work guarantee. In other words, White takes the position that employers will now have a business necessity to demand a medical reevaluation of every employee returning to work from FMLA leave based on the fact of the leave alone. This is not the case. The mere fact that an employee went on FMLA leave, or had a medical condition justifying FMLA leave, would not normally create a business necessity without evidence that the condition impacted, or posed a risk to, the employee's work. In the instant case, we are concerned with the unique situation of a peace officer who carries a weapon; in such a situation, the employee's depression alone is sufficient to justify an examination. This, however, will not necessarily be the case with all other employees taking FMLA leave.

e. *Conclusion on FMLA Issues*

In short, there is no violation of the FMLA as a matter of law. White's doctor certified her to return to duty; under the FMLA, White was entitled to be restored to employment, no more. White was restored to employment, as required. The DA then sought a FFDE, as it questioned White's fitness for duty in light of her severe depression, and instances in which that depression, and her prior inability to manage it: (1) caused White to put her own safety in danger; (2) called into question White's ability to react properly in tactical situations; and (3) caused her to give unprofessional, and possibly false, testimony in a criminal case.[20] The DA's order that White appear for a FFDE did not violate the FMLA. The DA was therefore entitled to judgment in this matter. As the post-judgment attorney fee order awarded fees to White based on the DA's purported violation of the FMLA (29 U.S.C., § 2617(a)(3)), that order must also be reversed.

---

[20] In this regard, we again note that Dr. de Brito's Certification of Health Care Provider form at the start of White's FMLA leave indicated that it was *unknown* whether White would subsequently have flare-ups of her condition.

## *DISPOSITION*

The judgment is reversed and the matter is remanded with directions to the trial court to dissolve the injunction, discharge the writ of mandate, and enter judgment in favor of the DA.  The post-judgment order awarding White attorney fees is also reversed.  The DA shall recover its costs on appeal.


**CERTIFIED FOR PUBLICATION**


CROSKEY, Acting P. J.

WE CONCUR:


KITCHING, J.


ALDRICH, J.